## Appeal of T. Downing Lindley et al.
## Appeal of William S. Perot et al.
## Appeal of Joseph S. Perot et al.

1. A testator, owning land derived by descent from his mother, by his will devised his residuary estate to his executors in trust, inter alia, to invest and keep the same invested ; to collect the income, issues and profits thereof ; to pay all taxes, expenses and repairs ; to pay the net income to his wife for life ; upon her death "to divide the principal of my said residuary estate among such persons and in such proportions as is provided for by the intestate laws of Pennsylvania, it being my will that in the event of my dying without issue that after the death of my wife the whole of my estate shall vest in and be divided among my next of kin or heirs at law the same as though I had died intestate and unmarried." The testator, after creating a trust in favor of his wife and· of any children whom he might have and who might survive him, directed; "I further authorize and empower my executors to make sale, in their discretion, of any real estate for the purposes of· this trust, and to make deeds to the purchaser or purchasers thereof without any liability on the part of the purchasers to see to the application of the purchase money."

The testator survived his wife and died without issue. In a contest between his next of kin, who were *ex parte paterna*, and his heirs *ex parte materna*, for a fund consisting of rents of certain of said real estate derived by testator by descent from his mother, and the proceeds of sales of certain parts thereof : *Held,*

(1) That the will did not work a conversion of testator's real estate.

(2) That the testator's heirs *ex parte materna*, and not his next of kin, were entitled to said rents and proceeds of sale of real estate derived by testator from his mother.

(3) That of the testator's relatives *ex parte materna*, his nearest living relatives, to wit : the children of a deceased great-great-maternal-uncle were entitled to take to the exclusion of grand children of said deceased great-great-uncle, the latter not being entitled to take by representation the share their parents would have taken if living.

2. Dundas's Appeal, 14 P. F. S. 325 ; Page's Estate, 25 P. F. S. 87 ; and Roland *v.* Miller, 11 W. N. C. 431, distinguished.

January 29th and 30th 1883. Before MERCUR, C. J., PAXSON, STERRETT, GREEN and CLARK, JJ. GORDON and TRUNKEY, JJ., absent.

APPEALS from the Orphans' Court of *Philadelphia county:* Of January Term 1883, Nos. 149, 142, and 150.

These were three separate appeals from a decree of the Orphans' Court of Philadelphia county, in the matter of the adjudication of the account of Elliston P. Morris, surviving executor of the will of Perot Lardner, deceased, and the distribution of the balance in the hands of the accountant.

Upon the audit, before PENROSE, J., the following facts appeared :—

[Perot's Appeal.]

Perot Lardner died April 29th 1881, leaving a will and codicil thereto, both dated May 17th 1879, possessed of a large personal estate, and seised of certain real estate which he derived by descent from his father, and of other real estate which he derived by descent· from his mother. He survived his wife (who died after the date of his will) and died without issue.

Under a testamentary power (hereinafter recited) his executors sold certain parcels of testator's real estate derived by him *ex parte paterna*, and other parcels derived *ex parte materna*. As an incident of the power to sell, they also collected rents from both classes of real estate.*

The fund for distribution consisted, besides personalty, of said rents and proceeds of 'realty, the derivation of which whether from real estate derived *ex parte paterna* or *ex parte materna* was particularly specified in the account.

There was no contest as to the distribution of the personalty and of the rents and proceeds of sale of real estate derived *ex parte paterna;* the question being as to who were the parties. entitled to the rents and proceeds of real estate derived *ex parte materna*.

Of this last mentioned real estate, the testator's mother, Mary P. Lardner, acquired title to certain portions or undivided interests *by purchase;* and she acquired title to certain other portions or undivided interests *by inheritance* (*a*) from Charles Perot (first purchaser) (*b*) from John and Elliston Perot (first purchasers).

The testator's will and codicil were as follows :—

In the name of God Amen. I Perot Lardner of the city of Philadelphia, being of sound and disposing mind, memory and understanding, do make publicly and declare this my last will and testament, revoking and making void all other wills and testaments heretofore made by me.

1. I direct that all my just debts be fully paid and satisfied.

2. I give and bequeath to my uncle, Richard Penn Lardner, the sum of ten thousand dollars.

3. I give and bequeath to my uncle, James Laurence Lardner, the sum of ten thousand dollars.

4. I give and bequeath to Esther Lardner, widow of my late uncle Alexander Lardner, the sum of ten thousand dollars.

---

* The following is an extract from the adjudication : "A doubt was suggested as to the right of the executor, to collect rents, and as to the jurisdiction of the Orphans' Court to make distribution of the rents so collected. The parties in interest are, however, sui juris, and competent to agree to refer the matter to the auditing judge, and they have, through their counsel, requested that the question raised should be considered by him." See Cobb *v.* Biddle, 2 Harris 444.

5. I give and bequeath to my friend Elliston Perot Morris, the sum of one hundred thousand dollars.

6. I give and bequeath to my friend, Lewis Waln Smith, the sum of ten thousand dollars.

7 I give and bequeath to my friend, Hannah M. Lindley, the sum of ten thousand dollars.

8. I give and bequeath to my friend, Elizabeth Lindley, the sum of ten thousand dollars.

9. I give and bequeath to the following named Institutions the following respective sums; unto The Orphan Society of Philadelphia the sum of two thousand dollars; unto the contributors to the Pennsylvania Hospital the sum of five thousand dollars; unto the Atheneum of Philadelphia the sum of two thousand dollars; unto the Lincoln Institution the sum of two thousand dollars; unto the Protestant Episcopal Church at Oxford, commonly called The Oxford Church, the sum of two thousand dollars.

10. I give and bequeath to the commissioners of Fairmount Park the sum of one thousand dollars to be expended by them in buying and planting English Oaks in the said park.

11. I give and bequeath to the hospital of the Protestant Episcopal Church in Philadelphia, situated on Lehigh Avenue, the sum of five thousand dollars.

12. I give and bequeath to my wife, Ellen M. Lardner, the sum of two hundred thousand dollars absolutely.

13. It is my will that all the legacies hereby left by me shall be paid in full clear of the collateral inheritance tax which I direct shall be paid by my executors out of my residuary estate.

14. All the rest residue and remainder of my estate real and personal of whatsoever kind and wheresoever situated of which I may die seized I give, bequeath and devise unto my executors hereinafter named or the survivor of them, the heirs, executors, administrators and assigns of said survivor, in trust nevertheless to invest the same and keep the same invested in any such securities as they may deem most prudent, taking care to select such as commend themselves rather for security than for a high rate of interest and at their or his pleasure to change said investments and to collect the income, issues and profits thereof, and after paying taxes, expenses, repairs and all charges, to pay over the net income, issues and profits quarterly, should I die without a child or children, to my wife Ellen M. Lardner, for and during her natural life the said payments to be made to her personally upon her own receipts and not to be subject to any control in any way of any husband that she may have, nor to any anticipation, sale or alienation or disposal by her own act or by any acts of law whether for or without consideration, nor

to any debts, contracts or engagements contracted or hereafter to be contracted by her, nor to any attachment or execution of any kind whatsoever, and upon her death, to divide the principal of my said residuary estate among such persons and in such proportions as is provided for by the intestate laws of Pennsylvania, it being my will that in the event of my dying without issue that after the death of my wife Ellen, the whole of my estate shall vest in and be divided among my next of kin or heirs at law the same as though I had died intestate and unmarried.

The foregoing provision as to both the income and principal of the said trust estate to be of effect solely and only in case I should die without leaving a child or children or the descendants of a child or children living at the time of my death. In the event of my dying leaving my wife surviving me, and also a child or children or the descendants of a child or children, then I direct my said executors to pay over to my wife, Ellen, one-third of the net income of the said trust estate during her natural life upon the same restrictions as above set forth, and the remaining two-thirds of the said income they shall reinvest from time to time after making such allowance for the maintenance and education of the said child or children as they may deem proper, and continue to hold the same in trust until my youngest child shall reach the age of twenty-one years. On the happening of that event, I direct my executors to set aside one-third of the principal of my estate, and to continue to hold the same in trust, the income thereof being payable to my wife, Ellen, as above set forth, and at her death the principal to be conveyed by them to my child or children or the descendants of such child or children should the child be dead free from any trust whatsoever.

The remaining two-thirds of the principal of my residuary estate, together with all accumulated income, I direct my executors to divide according to their best discretion into as many equal parts as I may have children, and to convey one of such parts to each of my children or to the descendants of any child who may be dead, such descendants taking their parents' portion, free clear and discharged of any trust whatsoever. I further direct that on any of my sons reaching the age of eighteen years my executors shall pay to him the sum of twenty-five thousand dollars out of either the income or principal of the said trust estate, so that he may dispose of the same as he may see fit. I further authorize and empower my said executors to make sale in their discretion of any real estate for the purposes of this trust, and to make deeds to the purchaser or purchasers thereof without any liability on the part of the purchasers to see to the application of the purchase-money.

[Perot's Appeal.]

15. The above and foregoing provisions I have made for my wife Ellen are to be received by her in full lieu and discharge of dower.

16. I nominate, constitute and appoint my friends, Elliston P. Morris and Lewis Waln Smith, executors of this my last will, hereby authorizing them, as executors, to make sale of any of my real estate, and to execute and deliver deeds therefor without any liability on the part of the purchaser to see to the application of the purchase-money.

In witness whereof I have hereto set my hand and seal this seventeenth day of May A. D. 1879.

PEROT LARDNER. [SEAL]

(Signed, sealed, &c., &c., in presence of two subscribing witnesses.)

CODICIL.

I, Perot Lardner, do hereby make and publish this codicil to my foregoing will and testament. Considering the uncertainty of life, I desire that after the full administration of my estate by my executors, who are named in the said foregoing will, that the number of trustees under the 14 paragraph of the said will should be increased from two to three. I therefore direct my said executors, Elliston P. Morris and Lewis Waln Smith, after the final settlement of their accounts as executors to pay over the balance in their hands, and to convey all real estate which may not have been sold by them to Elliston P. Morris, Lewis Waln Smith and William E. Littleton as trustees, or to the survivors or survivor of them, they to hold the same in trust, and dispose thereof in accordance with the powers and directions heretofore given to my executors in the 14 paragraph of the said will. I further direct that in case of the death resignation or inability to act on the part of any one or two of the three trustees herein named, the remaining two or the survivor, if two should die or resign, shall immediately nominate and appoint a suitable person or persons to fill such vacancy or vacancies, and said appointment shall be evidenced by a duly signed acknowledged and recorded declaration by the said survivor or survivors that he or they have exercised this power of appointment, whereupon the party or parties so nominated and appointed shall succeed to all the powers of said trust hereinbefore conferred upon my executors, it being my express will that there shall always be three active trustees under the said trust. I hereby republish all the other provisions of said will. In witness whereof, I have hereto set my hand and seal this seventeenth day of May A. D. 1879.

PEROT LARDNER (SEAL).

(Signed, sealed, &c., &c., in presence of the same two subscribing witnesses.)

Duly proved by the two subscribing witnesses, May 4th 1881, and letters testamentary granted to Elliston P. Morris and Lewis Waln Smith. The latter died June 17th 1881.

At the audit the said funds in dispute were claimed—

I. By Richard Penn Lardner, a *paternal* uncle of testator and by the several children of four deceased *paternal* uncles of testator.

II. By the several appellants as heirs of the testator tracing their relationship *ex parte materna*.

The former class based their claim upon a construction of testator's will, that equitable conversion had been effected of all the testator's real estate, including that derived *ex parte materna*, by virtue whereof the proceeds thereof, being personalty, were distributable to them as testator's next of kin, without distinction of blood.

The latter class denied that equitable conversion had been effected, and insisted that under the clause in testator's will wherein he directed, that, "in the event of my dying without issue, after the death of my wife, Ellen, the whole of my estate shall vest in and be divided among my next of kin or heirs at law, the same as though I had died intestate and unmarried," the testator (so far as devolution of title was concerned) died intestate as to the real estate in question, which descended, according to the canon, to this class of claimants, as his heirs at law, being of the respective blood of the said first purchasers.

This latter class of claimants (*ex parte materna*) was subdivided into three classes, viz.:

(1.) T. Downing Lindley, Hannah M. Lindley, and Elizabeth D. Lindley, nearest relatives of the testator of the blood of his mother. (They were first cousins of testator's mother on the side of her father John J. Downing, being children of Sarah A. Lindley, a deceased sister of said John J. Downing.)

(2.) William S. Perot and Francis Perot, nearest relatives of the testator of the blood of said Charles Perot and of the said John and Elliston Perot. (They were children of said Elliston, nephews of said John and first cousins of said Charles Perot.)

(3.) Joseph S. Perot, Elliston L. Perot, Effingham Perot, Hannah P. Morris, Samuel Morris, and Beulah M. Rhoads, who were also relatives of the testator of the blood of said Charles Perot and of the said John and Elliston Perot, but a generation more remote than were said William S. and Francis Perot. (They were children of a deceased brother and of a deceased sister of said William S. and Francis Perot.)

The following table shows the several relationships above set forth.

6 OUTERBRIDGE.—16

The auditing judge (Penrose, J.), decided—

1. That the will of Perot Lardner, deceased, did not work a conversion of his real estate into personalty.

2. That the real estate of said Perot Lardner, deceased, which he inherited from his mother, descended to his next of kin *ex parte materna*, in the following manner, viz:

(*a*) As to so much of said real estate as the testator's mother acquired *by purchase*, the same descended to said T. Dowling Lindley, Hannah M. Lindley and Elizabeth D. Lindley, nearest relatives of the testator of the blood of his mother.

(*b*) As to so much of said real estate as the testator's mother acquired *by inheritance from Charles Perot*, the same descended to said William S. Perot and Francis Perot, nearest relatives of the testator of the blood of said Charles Perot.

(*c*) As to so much of said real estate as the testator's mother acquired *by inheritance from John Perot and Elliston Perot*, the same descended to said William S. Perot and Francis Perot, nearest relatives of the testator of the blood of said John and Elliston Perot.

(*d*) That said Joseph S. Perot, Elliston L. Perot, Effingham Perot, Hannah P. Morris and Beulah M. Rhoads, although related to testator, and of the blood of said Charles Perot and of said John and Elliston Perot, yet being a generation more remote than said William S. and Francis Perot, were not within any Act of Assembly extending representation among collaterals so as to include them, and they were, therefore, not entitled to any of said real estate, or to participate in the distribution of the results and proceeds thereof.

3. The rents and proceeds of the real estate so as aforesaid acquired by testator *ex parte materna*, collected and received by his executors under power in the will, were distributed to the several parties above mentioned in the manner and proportions in which they would have been entitled to the said respective classes of real estate, had the same remained unsold by the executors.

To this adjudication and decree, exceptions were filed by said Richard Penn Lardner and others, relatives of the testator *ex parte paterna*, viz:

The learned judge erred in deciding that the will of Perot Lardner, deceased, did not work a conversion of his real estate; and in not awarding to the exceptants as next of kin of said Perot Lardner (without distinction of blood) all the rents and proceeds of real estate comprised in the executor's account.

The following exceptions to the adjudication and decree were also filed by Joseph S. Perot et al.

1. Because the learned judge erred in awarding the rents collected by the accountant from the several premises and

ground-rents mentioned in the account filed and in the adjudication, to William S. Perot and Francis Perot.

2. Because the learned judge erred in not awarding their due proportion of the said rents to the exceptants.

3. Because the learned judge erred in deciding that there is no Act of Assembly extending representation among collaterals, so as to include the exceptants.

4. Because the learned judge erred in deciding that the exceptants are not entitled to participate in the distribution of the said rents, or any part thereof.

The court, after argument, sustained the said exceptions filed by Richard Penn Lardner et al., ASHMAN, J., delivering the following opinion :—" With Dundas's Appeal, 14 P. F. Smith 325, before us, emphasized by the later case of Page's Estate, 25 P. F. Smith 87, and Roland *v.* Miller, 39 Leg. Intel. 356, in which the principles of that decision were accepted as operative, we are forced to the conclusion that the will of the testator worked a conversion of his real estate. Among the reasons which give the earliest of these cases a controlling application to the present, are the gift of the residuary estate, real and personal, to the executors, in trust, to invest the same in such securities as they should select, coupled with a power of sale and a direction, after a final settlement of their accounts, to pay over the balance in their hands, and to convey such real estate as may remain unsold, to the trustees, who were to " succeed to all the powers of the said trust." The gift to the life tenant may also be specified, which carefully enumerates the income, issues and profits, but omits mention of rents ; and the gift of $25,000 to each son, as he should attain eighteen years of age, which was to be paid out of either the principal or income. In these provisions of the will an intent to create from the blended realty and personalty, a fund in money for the purposes of distribution, is at least as discernable as in Dundas's Appeal and Roland *v.* Miller, and this circumstance, in all of the cases cited, was recognized as equivalent to an express direction to sell. Excluding the trust for the children, which failed because the testator died childless, we find, immediately following the special power of sale for the purposes of that trust, a general and unlimited power to sell, which was designed to meet the event which has actually happened. No analogy is presented between this and the last reported case in which the question was fully argued (Peterson's Appeal, 7 Nor. 397), because in that case the children were expressly privileged to take the land itself at a valuation, a provision which effectually negatived the theory of a conversion by the testator. The intent is the sole test of conversion, and a devise, as here, to the executors for the purpose of sale, manifests an intent to convert :

Chew *v.* Nicklin, 9 Wr. 84. The objection that the distribution was ordered among heirs as well as next of kin, and that the executors were to pay the taxes and repairs, does not, we think, conflict with our view of the testator's intention. His use of the phrase "next of kin or heirs at law," shows that he regarded those expressions as convertible terms, and we cannot, in the face of his intention elsewhere to the contrary, substitute "and" for the disjunctive which he has employed. So the executors might properly be enjoined in the will to provide for the taxes and repairs of the real estate, when the direction to convey to the trustees what remained unsold, indicated the testator's belief that all of the property would not be disposed of within the year.

"More doubt, perhaps, attaches to the remaining question. In the event of his death without issue, the testator declared his will to be that his whole estate, after his wife's death, should be divided among his heirs or next of kin, as though he had died intestate and unmarried. The auditing judge found these words to be descriptive of so literal a dying without a will, as to obliterate all the provisions for a sale and investment of the real estate; and he therefore awarded a part of the proceeds, representing the real estate which had descended *ex parte materna* to the heirs on the mother's side. In opposition to this rendering it is to be observed that immediately after this proviso for a distribution under the intestate laws, the testator confers the power to sell, and directs the payment over of the proceeds. May we not reasonably infer that the estate as thus proposed to be converted was in the mind of the testator when he designated the parties who were to take? If we hold that, as to those parties, the will was to be treated as if it had never been written, we at once ignore all which precedes and follows the intestate clause, descriptive of the estate which was the subject of the gift. We must also ignore the appointment of the trustees, because the intestate clause expressly declares that the whole of the estate shall vest in and be divided among the next of kin or heirs at law, as though the decedent had died intestate. The difficulty disappears with the statement that when the testator penned the clause in question he had already stamped his property with the character of personalty, and it was therefore of personal estate alone that his direction as to intestacy was predicated. We are told that, in doubtful cases, that construction is to be preferred which most nearly conforms to the statutes of distribution: Smith's Estate, 11 Har. 9. But there is no disposition in what has been said to evade those statutes; the inquiry simply concerns the fund upon which the statutes are to operate. On the whole, we conclude that the testator, having

[Perot's Appeal.]

worked a conversion by his will, intended his estate to go as personalty to his next of kin, under the intestate laws.

This determination renders it unnecessary to consider the objections which were raised by the children of Joseph Perot, inasmuch as the parties through whom they claim could take only as heirs on the part of the mother, and have no interest in the personal estate of the decedent.

The other exceptions to the adjudication are therefore sustained.

PENROSE, J., filed the following dissenting opinion :—

That a conversion of his real estate was not contemplated by the testator as a result of his direction to invest and keep invested is plain from the provision for the payment of " taxes and repairs " out of the income ; and that an express order to sell, or its equivalent, is necessary to make realty pass as personal estate has been so often decided that the question is no longer an open one. See Patterson's Appeal, 7 Norris 397. But, as if to guard against any possibility of mistake, the testator, who had created the trust and made all the provisions with regard to sale and conveyance solely in the interest of his' wife and issue, declared in express terms that, should she die without issue (an event which occurred in his lifetime), his estate should go " the same as though " he had " died intestate and unmarried," to his heirs at law or next of kin.

Where there is no ambiguity in the words used, there is no room for interpretation. This principle was applied in the very recent case of Biddle's Appeal, 39 Leg. Intell. 420, though the effect of a literal adherence to the language of the testator was to lead to a confessedly purposeless accumulation. Certainly astuteness seems out of place where, as here, its exercise is so directed as to take an estate from the natural heirs and give it to strangers to the blood of the purchaser.

Had the testator died intestate, it could not, of course, have been pretended that there was a conversion, and his real estate would, under the intestate laws, have passed to his " heirs." Why, then, in the face of his express declaration, should it be supposed that he meant anything other or less than what he has said ; and that, for the purpose of conversion and change of descent, he must, in spite of himself, be regarded as testate? What he has said is, " it being my will that in the event of my dying without issue, that after the death of my wife the whole of my estate shall vest in, and be divided among, my next of kin or heirs at law, the same as though I had died intestate and unmarried."

Why does he use the word "heirs" if the lands were to pass as personalty ? What right have we to say, where both

these terms are employed, and the estate consists of both realty and personalty, that they are used in the same sense, and that the word "heirs" the appropriate word for the devolution of real estate, is to be disregarded as redundant and of no legal effect?

We are told by the text-books that, "where a testator uses an additional word or phrase, he shall be presumed to have an additional meaning;" that "the construction is to be preferred which rejects nothing and gives effect to every word;" that "in doubtful cases the interpretation is to conform as nearly as may be to the course of descent;" and that "the heir is not to be disinherited by any forced construction, and all doubts are to be resolved in his favor." Bredlinger *v.* Bredlinger, 2 Casey 132; Bender *v.* Dictrick, 7 W. & S. 284; Cowles *v.* Cowles, 3 Smith 176; France's Appeal, 25 Smith 220; Rupp *v.* Eberly, 29 Smith 141.

The personal estate of this testator, amounting to over a million of dollars, and the real estate descending *ex parte paterna*, go, admittedly, to the next of kin. To give them in addition the lands descending *ex parte materna*, they not being of the blood of the purchasing ancestor, to the exclusion of the heirs who are, involves, in my opinion, a disregard of elementary principles, and an utter perversion of the language of the testator. Such a construction may well be called *maledicta expositio quæ corrumpit textum.*

It only remains to add that the suggestion that the heirs were strangers to the decedent is not only unwarranted by the record or by anything found by the auditing judge, but is directly contradicted by the will itself, which gives large legacies to some of them.

A decree was entered, in accordance with the opinion of the court, distributing the funds in question to and among the said Richard Penn Lardner and others, next of kin of said Perot Lardner, without distinction of blood, in equal shares.

From this decree three separate appeals were taken, viz.:

I. Appeal of T. Downing Lindley, Hannah M. Lindley and Elizabeth D. Lindley.

The specifications of error filed in this appeal were as follows:—

1. The court erred in awarding the proceeds of certain real estate, purchased by the mother of testator and which had descended to him as her heir, to Richard Lardner et al. who were the next of kin of the testator, but were not the heirs of testator of lands which descended to him from his mother, and were not of the blood of the mother.

2. The court erred in not awarding the said proceeds to T.

[Perot's Appeal.]

Downing Lindley, Hannah M. Lindley and Elizabeth D. Lindley, who were the persons entitled to the land, of which said fund were the proceeds, if the same had not been sold by the executor of the testator.

3. The court erred in not awarding to the appellants the rents of lands purchased by the mother of the testator, and which had descended to him as her heir.

4. The court erred in reversing the decree made by the auditing judge; whereas that decree should have been affirmed.

5. The court erred in deciding that the will worked a conversion of the land.

6. The court erred in deciding that if there was a conversion by the will the effect of that conversion was to vest the proceeds in the persons entitled under the intestate laws; whereas by the will they were given to the persons that would have taken the land in case of intestacy.

II. Appeal of William S. Perot and Francis Perot.

The following were the specifications of error filed in this appeal:—

1. The court below erred in holding that the will of Perot Lardner, deceased, worked a conversion of his real estate.

2. The court below erred in distributing the balance of the rents and proceeds of the real estate descending *ex parte materna* among the next of kin of the decedent.

3. The court below erred in not awarding the balance of the rents and proceeds of the real estate of said decedent, descending *ex parte materna* to the heirs of said decedent, who were of the blood of the first purchasers thereof.

III. Appeal of Joseph S. Perot, Elliston L. Perot, Effingham Perot, Hannah P. Morris, Samuel Morris, and Beulah M. Rhoads.

The following specifications of error were filed in this appeal:—

1. The learned court below erred in holding that the will of Perot Lardner worked a conversion of his real estate into personalty.

2. In decreeing distribution of the rents of real estate to the persons named in the decree of the court.

3. In dismissing the exceptions of the appellants.

4. In not decreeing that the appellants should have paid to them their due share of the rents of the real estate which became vested in Perot Lardner *ex parte materna*.

5. In not decreeing that the appellants take by representation the shares of the rents of the said real estate, which would have been payable to their respective parents, if living.

6. In not awarding to the appellants their due and full proportion of the said rents.

The said appeals I. and II. were argued together January 29th 1883, and the third appeal was argued separately on the following day.

*Richard C. McMurtrie* (*Wm. Rotch Wister* with him), for T. Downing Lindley et al., appellants.—We contend that the court below erred (1) in holding that the will worked a conversion, (2) in holding that the testator intended that the persons to take all his estate were the distributees of his personal estate under the intestate laws.

1. There was no conversion. There was no positive direction to sell. There were two powers to sell vested in the executors : one for the purpose of a trust for children, which he never had, and for a wife, who died before he did ; the other, in the discretion of the executors generally. Such powers, which need not and might not ever be exercised, did not per se effect conversion—the land remained land after testator's death ; it vested in the heir or devisee, who is entitled to rents, until the power of sale is exercised. When exercised, the estate sold is that of the heir or devisee, not that of the testator, for if it was, the lien of debts would be discharged, which is not the case unless that be the express object of the power : Boshart *v.* Evans, 5 Whart. 562 ; Blight *v.* The Bank, 10 Barr 131 ; Anewalt's Appeal, 6 Wright 414 ; Wells *v.* Sloyer, 3 Clark 203 ; Chew *v.* Nicklin, 9 Wright 84 ; Blight *v.* Wright, 1 Phila. 549 ; Adams' Eq. 296, note 1, 297, note 1.

The trust to " invest" failed for want of cestuis que trustent in existence. Nor did it indicate an intention to " convert," for the trustees were to apply income to " paying taxes, expenses, repairs," and one can't " repair " investments. And by the codicil, testator directs his executors " to convey all real estate which may not have been sold by them " to trustees for the purposes designated in his will. The rational construction of the powers of sale is that testator authorized a sale, for the more convenient distribution to the persons who would have taken had there been no sale or power of sale. The authority to sell can have no effect upon the question who is to take. This case is different from the class of cases cited by the appellees, such as Evans *v.* Chew, 21 P. F. S. 47, and Roland *v.* Miller, 4 Out. 47, in which, unless there was conversion, there was nothing in the will which indicated to whom the property should go. If, under existing circumstances, this were a case of actual intestacy, the duty of administrators would be just what is the duty of the executor—no more, no less—yet it is argued that because there is vested in the executor a power of sale for a contingency which has not, and cannot happen, a con-

[Perot's Appeal.]

version is effected, and parties become entitled to take who would not otherwise take under the will.

2. Assuming there was no conversion, who are the parties entitled? They are not named in the will, but are described in these words: " Such persons, and in such proportions as is provided for by the intestate laws of Pennsylvania, it being my will that . . . [in the contingency which has happened] . . . the whole of my estate shall vest in and be divided among my next of kin or heirs at law, the same as though I had died intestate and unmarried." There is nothing illegal or irrational in a testator adopting the provisions of the intestate laws as a designatio personarum. "Next of kin " or "heirs at law" is as certain as if the persons to whom those descriptions apply at the testator's death were named individually. Those persons take, immediately on testator's death, "the same as though he had died intestate and unmarried." The court below strike out one class named—" heirs at law "—and recognize alone the other class named—" next of kin." But to disinherit an heir, requires not merely an express exclusion, but an actual devise to some one else, for lapsed devises go to the heir. Uncertainty of meaning determines the construction in favor of descent by law: Lipman's Appeal, 6 Cas. 184; Rupp v. Eberly, 29 P. F. S. 141. The court, misled by their theory of conversion, thought that warranted their finding an intention in the will to override the expressed intention in favor of the heir. But if a testator clearly expresses his intention to die "the same as if intestate," how can another and repugnant intention be found in the will?

3. The argument drawn from the intent to blend real and personal estate is a fallacy. The only legal effect of "blending " is that legacies may be paid from land if the personalty be deficient. But here, the only blending is in the devise to the executors for the trust which never took effect. And any supposable intent to blend the proceeds in distribution is expressly negatived by the words " next of kin or heirs at law," where the property is not blended but divided.

4. The court below mistook the effect of the cases relied on. In Dundas's Appeal the power of sale had been actually executed. Page's Estate is the very reverse of the rule extracted from it.

*E. Coppée Mitchell* and *Wm. Henry Rawle*, for the appellees.—In construing a will, in order to reach the testator's intention, it is proper to consider his circumstances when writing it. This testator owned realty and personalty. His legal adviser doubtless informed him that if he died intestate without widow or issue, his real estate would descend according to the

most complicated rules of inheritance, dependent upon whether he derived title *ex parte paterna* or *ex parte materna ;* but as to his personalty, the devolution would be perfectly simple, to his next of kin.   He would naturally say, why cannot it all go as if I had myself purchased the realty? and on receiving the reply, so it can, if you convert it, he, as we contend, adopted that plan and gave his executors full power of sale of all his real estate, directing them to "invest and re-invest" the proceeds, and on settlement of their accounts, pay over the balance in their hands and convey any real estate remaining unsold to trustees to " dispose thereof in accordance with the powers and directions hereinbefore given to my executors"—*i.e.,* inter alia, to convert the unsold real estate.   The word " convey " is used here in a formal or physical sense, viz., to execute deeds from one set of fiduciaries to another set.   His *general intent* was conversion, sooner or later.   With the exception of providing for temporary care-taking of the real estate until sold, all the words of the will relate to personalty and not realty.   He directs all his residuary estate, real and personal, to be invested in " securities," the " income, issues and profits " to be paid over quarterly, and the "principal of my said residuary estate " to be divided, &c.   Page's Estate does decide that a devise of " all one's estate, real and personal, to be invested in securities " works conversion.   Roland *v.* Miller is to the same effect.   It is sought to avoid the effect of Dundas's appeal, by the fact that an actual sale had been made.   The fund for distribution here was, likewise, the proceeds of actual sales, so that case is directly applicable ;  but this is immaterial, as the doctrine of conversion applies independently of actual sale.   More discretion as to time and mode of sale does not affect the question of conversion : Leiper *v.* Thomson, 10 P. F. S. 177 ; Tazewell *v.* Smith, 1 Randolph 320 ; Stagg *v.* Jackson, 1 Comstock 212. The conversion was not merely for administration of the trust, which failed, but a principal object was for the " division " of the residuary estate.   The argument, deduced from ancient English law, in favor of the heir at law, has no application under our intestate system, in which, beginning with Penn's agreement and charter, and running through our several intestate acts (the earliest of which were repealed by the crown and as often re-enacted here) down to the Act of 1833, the heir at law is never preferred to the next of kin : Purd. Dig. 809. The only survival with us of ancient doctrines of inheritance is that when the heir at law is entitled, real estate descends according to the blood of the first purchaser.   This case illustrates its absurdity, for according to that canon, we must, in order to find the testator's heirs as to real estate *ex parte materna,* ignore his near relatives, on his father's side, and go

back to the testator's maternal great-great-grandfather to establish collateral relationship in the appellants, *ex parte materna*. The testator expressly ignores blood-relationship as to three of these appellants, by describing them, in pecuniary bequests, as "my friend," thus illustrating the remark of Chancellor Kent (4 Com. 411), "the stream of the natural affections, so remote from the object, must flow cool and languid." In the bequests to his paternal uncles, the testator mentions the relationship.

Assuming conversion, the words "heirs" and "next of kin" are convertible terms, representing one and the same class, viz., next of kin only : Lowndes *v.* Stone, 4 Ves. 649 ; Thompson's Trusts, Law Rep. 9 Ch. Div. 607 ; Roland *v.* Miller, 4 Out. 47 ; Lord *v.* Bourne, 63 Me. 368. A Pennsylvania court will not at this day disturb a conversion worked by a testator, because the words "heirs at law" are used disjunctively after the words "next of kin." The reasoning of the judge in the opinion of the court below, as to the construction of the words "as though I had died intestate," is incontrovertible. In order to reach the result contended for by the appellants, it is necessary to interpolate the words "as though I had not converted my estate into personalty," which would destroy the testator's primary intent, to wit, conversion into personalty, and distribution as such, according to the intestate law.

*John G. Johnson*, for William S. Perot and Francis Perot, appellants.—A very simple case has been clouded by excess of learning. If there is any intention apparent from the testator's will, it is that, for the purpose of ascertaining to whom his estate shall go, in the contingency which has happened, the will shall be considered as never having been made. His positive direction is that those shall take who would have taken if he had died intestate, yet the award is to the appellees because of his testacy ! Powers of sale and other provisions for contingencies which did not happen are out of the case. According to the status of personalty or realty the distribution must be to next of kin or heirs at law. If a motive is sought for, it is found in the fact that that the testator never himself earned a dollar ; he inherited enormous wealth from the Perots, and he justly wanted that, in case of his death without widow or issue, his Perot real estate at least, should revert, under the law, to those of the blood of the ancestor from whom it came.

*Harry G. Clay*, for Joseph S. Perot, et al., appellants.—We concur with counsel for William S. and Francis Perot, in the position that there was no conversion, and that the testator's real estate acquired *ex parte materna* descends to his collateral

heirs *ex parte materna ;* but differ with them by insisting that
we are entitled to a portion of that real estate, claiming by
representation the shares our parents (deceased brother and
sister of said William S. and Francis Perot) would have taken
if living. As to the realty in which we claim an interest, Ellis-
ton Perot was the perquisitor, to whom we must go back to
trace relationship : Lewis *v.* Gorman, 5 Barr 164 ; Maffit *v.*
Clark, 6 W. & S. 261. While I do not admit that we would
be excluded from representation under the Act of 1833, yet,
granting for argument's sake that we would, we are clearly
entitled by virtue of the Act of April 27th 1855, § 2, extending
representation one generation beyond that provided by the for-
mer law. This Act provides : " Among collaterals, when by
existing laws entitled to inherit, the real and personal estate
shall descend and be distributed among the grandchildren of
brothers and sisters, and the children of uncles and aunts, by
representation, such descendants taking equally among them
such share as their parent would have taken if living." The
result of this legislation is " to introduce a new class of collateral
heirs, those who were one generation too remote to take under
the Act of 1833," and to substitute the *per stirpes* for the *per
capita* rule of inheritance in such cases : Lane's Appeal, 4 Casey
488 ; Brenneman's Appeal, 4 Wr. 116. The Act is an enabling
one and should be liberally construed : Miller's Appeal, 4 Wr.
57. The Act does not say whose grandchildren, or whose
brothers and sisters, or whose uncles and aunts. It is contended
by Mr. Johnson that the words " of the intestate " must be read
into the Act ; but this would not give due meaning to the expres-
sion " among collaterals, when by existing laws entitled to
inherit." We contend that the words " grandchildren of
brothers and sisters " refer to the grandchildren (and *a fortiori*
the children) of such brothers and sisters which as a class if all
living would have taken. That is to say, any brothers and
sisters, of the same generation, who would have inherited if
living ; and if dead, are represented by children or grandchildren.
Now Joseph Perot and Hannah Morris, deceased, the parents
of these appellants Joseph S. Perot et al., were the brothers and
sisters of the appellants William S. and Francis Perot, who are
living ; and if they are entitled, we are also entitled by repre-
sentation under the Act of 1855, to the shares their deceased
brother and sister, our parents, would have taken, if living.

*Johnson,* in reply.—If the Act of 1855 does not relate to
brothers and sisters or uncles and aunts of the intestate, it
relates to anybody's brothers and sisters, &c., tracing back the
pedigree indefinitely, which is absurd. " Brothers " and " sisters,"
" uncles " and " aunts," are relative words. An only child can

have no brothers or sisters, and there can be no uncle without a nephew. The grandchildren of a brother, or the children of an uncle, may take by representation. Brother, or uncle, of whom? There must be a pivot upon which the relation of brother, or uncle, can turn. As no one can be his own father, so no uncle can exist without a nephew, and no brother without some other being, male or female, who traces his, or her, existence, to the same parent. The nullius filius is known to the law, but not so the nullius frater.

In the present case, the appellants are neither the grand-children of a brother or sister of Perot Lardner, nor children of his uncle or aunt. They are not grandchildren of a brother or sister of the common ancestor, Elliston Perot, nor children of an uncle or aunt of the latter. How then can they take by representation, by virtue of an Act which only entitles grand-children of brothers and sisters, and children of uncles and aunts? If this Act does not confer upon them the right, they are without it, because they are one degree further removed than the appellees, who are "next of kin" and by all prior legislation, representation amongst collaterals was denied, after brothers' and sisters' children.

If appellants are right in their view, then they did not need the saving grace of the Act of 1855, for they are the children of a father or mother of whom the appellees were brothers— all "on the same plane." Their contention leads to this: There may be children of such brothers and sisters as are also uncles and aunts of an intestate. If the children of any persons who happen to be brothers and sisters of one another, were meant to inherit, then, under the old law, such children of brothers and sisters who were also uncles and aunts, would have taken. If so, why was it necessary, by the Act of 1855, to enact that "children of uncles and aunts" might take "by representation," and how did this court decide in Good v. Herr, 7 W. & S. 255, and Parr v. Bankhart, 22 Penn. 291, anterior to this later statute, that "the children of a deceased uncle are excluded when there are uncles or aunts surviving?" There is no possible question, under our intestate law, as to the person to whom relationship is to be traced for the purpose of determining whether or not there can be representation. The Act of 1833 says: "If such intestate shall leave neither brother nor sister." Then follows the proviso: "That there shall be no representation admitted amongst collaterals after brothers' and sisters' children." Is it open to doubt that the "brother and sister" referred to in the proviso are the brother and sister described in the Act, viz., those of the intestate? When the Act of 1855 allowed representation in one degree more remote, viz., amongst grandchildren of brothers and sisters, can we

possibly doubt that the same brother and sister were intended, viz., of the intestate?

Mr. Justice PAXSON delivered the opinion of the court, March 19th 1883.

The above appeals are from the same decree, and will be considered in the order in which they are stated.

## I.   APPEAL OF T. DOWNING LINDLEY ET AL.

Perot Lardner, whose will forms the subject of this contention, died April 29th 1881, seised of a large real estate and also personal property estimated at one million dollars. The testator derived a portion of his real estate by descent from his father, which was awarded to the Lardners, and is not the subject of dispute. Another portion of the real estate descended to the testator from his mother, and was claimed by the appellants, who are admittedly the testator's next of kin on the mother's side. The auditing judge awarded the funds arising from the sales of certain realty purchased by testator's mother, and the rents of other property bought by her, to the appellants. The court below set aside the adjudication and awarded the fund to the appellees, who are the heirs at law *ex parte paterna*, upon the ground that the will of Perot Lardner worked a conversion of his real estate, and that the same must be distributed as money. It is conceded that if there was a conversion the appellees are entitled.

We see no serious difficulty in the case beyond the fact that a large fortune is at stake. The will of Perot Lardner provides for two distinct contingencies. The first is the event of his dying without leaving a child or children or the descendant of a child or children living at the time of his death. After giving a number of pecuniary legacies to relatives, friends and public institutions, the testator bequeaths a legacy of two hundred thousand dollars to his wife, and the rest, residue and remainder of his estate to his executors in trust: 1st. To invest the same and keep the same invested; 2d. To collect the income, issues and profits thereof; 3d. To pay all taxes, expenses and repairs; 4th. To pay the remaining income to his wife, Ellen M. Lardner, for life; and, 5th. Upon the death of his said wife "to divide the principal of my residuary estate among such persons and in such proportions as is provided for by the intestate laws of Pennsylvania, it being my will that in the event of my dying without issue that after the death of my wife the whole of my estate shall vest in and be divided among my next of kin or heirs at law the same as though I had died intestate and unmarried."

The testator survived his wife and left no lineal descendants of any degree. This portion of his will therefore took effect. That his residuary estate must go to his "next of kin or heirs

at law" precisely as if he had died intestate, is too plain for argument, unless we find something else in the will which controls it. I will not stop to discuss the proposition that the direction to invest the residue and keep the same invested indicated an intention on the part of the testator to convert his real estate. It is sufficient to say in passing that the direction to invest was applicable to the personal estate, just as the word "repairs" applies to and was evidently intended for his real estate. In other words, the testator directed that his personal estate should be kept invested and that his real estate should be kept in repair.

But it is said the remainder of paragraph 14 of his will shows that the testator intended a conversion. This portion of paragraph 14 refers to the second contingency above referred to. It provides for the event of the testator leaving his wife and a child or children or the descendants of a child or children living at the time of his death. The contingency did not happen, and this portion of the will never took effect. It drops out of the case. It is vain to explore this alternate section of the will to ascertain what the testator intended in case of his death without leaving a wife and a child or children surviving. That he had already expressed, as clearly as language can make it.

The power of sale with which the 14th paragraph of the will concludes is as follows: " I further authorize and empower my said executors to make sale, in their discretion, of any real estate for the purposes of this trust and to make deeds to the purchaser or purchasers thereof without any liability on the part of the purchasers to see to the application of the purchase money." This is a mere discretionary power, and under the authorities does not work a conversion: Peterson's Appeal, 7 Norris 397; Jones v. Caldwell, 1 Outerbridge 42.

The learned court below was of opinion, however, that there was such a blending of the real and personal estate to create a fund for the purposes of distribution as to bring the case within the rulings of Dundas's Appeal, 14 P. F. S. 325; Page's Estate, 25 Ibid. 87, and Roland v. Miller, 4 Outerbridge 47. Some significance was also attached to the fact of the gift of $25,000 to each son as he should attain the age of eighteen years, which said legacy was to be paid out of either the principal or income; and to the further fact that the gift to the life tenant " which carefully enumerates the income, issues and profits but omits mention of rents."

The gift of $25,000 to each son occurs in that portion of the will which never took effect, by reason of the death of all of testator's lineal descendants during his own life. The omission of the word " rents" in the gift to the life tenant has no especial significance, for the reason that " income, issues and

profits " include the rents of the real estate. The word " issues " is an apt term to indicate the rents and profits derived from realty.

Nor are we able to see the applicability of the cases referred to. In Dundas's Appeal there was a conversion in fact. No question of the effect of an unexecuted power was before the court. On the contrary, the power had been fully executed, and the main contention was whether the executors should be surcharged for the actual value of a house alleged to have been sold at an under-price. The most that can be predicated of that case is that a trust for sale, with a power of sale, and an execution of the power, works a conversion. Anything beyond this is dictum. We are wholly unable to extract anything from Page's estate which favors a conversion of Perot Lardner's real estate. If authority at all upon this question its weight would seem to be on the other side. In the recent case of Roland v. Miller, there was a discretionary power given, which, after a time, became imperative, and it was held that it must be regarded as a trust, for unless it was executed no legatee could be paid. The legatees were given the proceeds only, not the estate or property itself. The execution of the power was therefore compulsory in order that the object of the testator might not be defeated, and it was held there was a conversion. This distinction has been frequently recognized : Chew v. Chew, 4 Casey 17; Evans v. Chew, 21 P. F. S. 47; and see 2 Sudgen on Powers.

The blending of real and personal estate by a testator in his will is not of much significance unless it clearly appears that he intended thereby to create a fund raised out of both real and personal estate, and to bequeath said fund as money. Where such a purpose is expressed and a power of sale given to carry it into effect, there is some room for holding that a conversion was intended. Nothing of the kind exists in this case. As before stated, the testator owned both real and personal estate at the time of his death. The manifest intent of his will is that his personal estate shall be kept invested, the real estate shall be kept in repair; the income, issues and profits be paid to his widow during her life, and at her death the whole of the residue of his estate " shall vest in and be divided among my next of kin or heirs at law the same as though I had died intestate and unmarried."

We cannot find within the four corners of Perot Lardner's will any satisfactory evidence of an intention to convert his real estate and to distribute it as money. On the contrary, the intention is manifest and emphatically expressed that in the contingency which has happened his property, both real and personal, shall go as if he had died intestate. This gives to the

[Perot's Appeal.]

heirs *ex parte materna* the real estate and the rents thereof, which descended to Perot Lardner through his mother.

II. Appeal of William S. Perot et al.

This appeal has been practically disposed of by what has been said in Lindley's appeal. In the court below the executor accounted for the rents of certain real estate belonging to the testator, of which he had taken possession and charge, which had descended under the intestate laws from the testator's mother. The appellants are heirs *ex parte materna* and the auditing judge awarded them the rents. Upon exceptions by the appellees, who were the next of kin on the side of the father, this adjudication was reversed, and the rents awarded to them. This was a logical result of the ruling of the court below upon the question of a conversion. Under our view of the law, it is manifest the rents must follow the real estate out of which it issued.

This appeal is sustained.

III. Appeal of Joseph S. Perot et al.

This appeal presents a different question. It having been settled by the preceding appeals that the will of Perot Lardner did not work a conversion of his real estate, and that the proceeds of the real estate which descended *ex parte materna* must be distributed to such of the heirs of said Perot Lardner as are of the blood of the first purchaser, the question now to be decided is whether Francis Perot and William S. Perot, who were the only children of Elliston Perot (a deceased great-great uncle of the testator) take exclusively, or in conjunction with the appellants who are the children of the deceased brothers and sisters of Francis and William S. Perot. The latter were living at the death of the testator, and claim in their own right; the appellants claim by representation through their deceased parents.

The precise question is whether the appellants can take by representation.

It is manifest they could not take under the Act of 1833, which provides: "That there shall be no representation admitted amongst collaterals after brothers' and sisters' children." We regard it as too plain for argument that the brothers and sisters referred to in the Act are the brothers and sisters of the intestate. This construction would exclude the appellants as they are not children of a brother or sister of the testator.

The appellants contend, however, that even if not within the Act of 1833, they are entitled to take under the 2d section of the Act of 27th April 1855, P. L. 368, which provides, "That among collaterals where by existing laws entitled to inherit, the real and personal estate shall descend, and be distributed among the grandchildren of brothers and sisters, and

the children of uncles and aunts by representation, such descendants taking equally among them such share as their parent would have taken if living."

The effect of this Act is to introduce a new class of collateral heirs—those who were one generation too remote to take under the Act of 1833: Lane's Appeal, 4 Casey 487. Under the Act of 1833, the children of brothers and sisters can take; under the Act of 1855, the grandchildren of brothers and sisters, and the children of uncles and aunts, can take by representation. But here again, the brothers and sisters must be the brothers and sisters of the intestate. The appellants do not come within the description of the Act of 1855. They are neither the grandchildren of a brother or sister of Perot Lardner, nor children of his uncle or aunt. They are not grandchildren of a brother or sister of the common ancestor, Elliston Perot, nor children of an uncle or aunt of the latter. We need not elaborate this point. We are of opinion that the appellants are not entitled to take either under the Act of 1833 or that of 1855, and their appeal must be dismissed.

The appeals of T. Downing Lindley et al., No. 149, of January Term 1883, and of William S. Perot et al., No. 142, of January Term 1883, are sustained, and as to them the decree is reversed at the costs of the respective appellees. The appeal of Joseph S. Perot et al., No. 150, January Term 1883, is dismissed, and as to them the decree is affirmed at the costs of the appellants. The adjudication of the auditing judge is affirmed, and it is ordered that distribution be made in accordance therewith.