(Surrogate's Court, Chautauqua County. April, 1905.)

**1. TRUSTS—CAPITAL AND INCOME.**

Testatrix owned a majority of the capital stock of a corporation, and controlled the same for nine years preceding her will and her death. The corporation retained from its earnings a liberal surplus to meet any unusual demand in the business and to provide for improvements, and paid a 15 per cent. dividend shortly after death of the testatrix for the preceding six months, leaving a large surplus on hand. Testatrix created five separate, but identical, trusts for the benefit of her grandchildren, the income and profits to be applied to the use of each grandchild in semiannual payments until such beneficiary should arrive at the age of 30 years, when the body of the trust was to be transferred to such grandchildren; they to take in equal shares. The executors were relieved from liability for depreciation in the value of the stock, and were authorized to sell the same whenever it seemed necessary. Between the death of the testatrix and the sale of the business of the corporation, all betterments were paid out of the earnings of the corporation, and the surplus earnings were paid over to the trustees and by them to the beneficiaries as income. *Held,* that the corpus of the trust estate was to be determined by the proportionate value of the plant and materials of the corporation, represented by shares of stock, together with the proportionate amount of working cash capital necessary to carry on its business.

**2. SAME.**

Where, under a will, the stock of a certain corporation was placed in trust, "the dividends, issues, and profits thereof" to be paid to the beneficiaries, the words "dividends, issues, and profits" were interchangeable with "income," and referred to the earnings paid over by the officers of the corporation in the form of dividends to the trustees.

**3. SAME—POWER OF TRUSTEE TO SELL ASSETS.**

Where a will authorized executors to sell certain shares of stock whenever necessary "for the preservation of the principal sum invested," their authority to sell was for such preservation only, and not for profits which might be realized on the sale thereof.

**4. SAME—CAPITAL AND INCOME.**

Where stock in a certain corporation was held in trust, the income to be paid to the beneficiaries of the trust, and the corporation went out of business and its assets were sold, that proportionate part of the price received on such sale represented by the shares of stock and items of increased amount of material, betterments, and good will of the company constituted a part of the capital of the trust estate, and not income.

**5. PERPETUITIES—ACCUMULATION OF INCOME.**

Where a will provides that shares of a corporation should be held in trust, and the income paid to the beneficiaries of the trust, and the corporation went out of business, the carrying of that part of the price of the sale of the assets represented by the betterments and good will of the company to the corpus of the estate did not violate the provisions of Laws 1897, p. 508, c. 417, § 4, against the accumulation of income.

**6. TRUSTS—CAPITAL AND INCOME.**

Where shares of a corporation were devised in trust, the income to be paid to the beneficiaries, and the corporation went out of business, and its assets were sold, the proportionate part of the working cash capital represented by the trust estate should be retained as part of the corpus of the estate.

**7. SAME—APPORTIONMENT OF LOSSES.**

Where a will created a trust and authorized the trustees to sell corporate stock constituting the trust estate and to invest the proceeds,

and exempted them from liability for losses, showing that testatrix realized that the value of the estate might fluctuate, and profits on investments are credited to capital, premiums paid on bonds purchased will be charged to capital and not to income.

In the matter of the accounting of Frederick H. Stevens and Ella Brooks Solano, as trustees under the will of Julia A. Brooks, deceased. Decree rendered.

George A. Lewis, for trustees.

Clare A. Pickard, special guardian, for Jesse Brooks Nichols.

John Ewen, for Jessie Brooks Tyler.

Fred Greiner, special guardian, for Kathleen and Gretchen Stevens.

F. S. Wheeler, special guardian, for Morris Tyler.

WOODBURY, S. Julia A. Brooks died a resident of this county on the 5th day of November, 1896, leaving a will bearing date October 5, 1896, which was on the 16th day of November of the same year admitted to probate by this court, and letters testamentary were thereupon issued to Frederick H. Stevens and Ella Brooks Solano, two of the three executors therein named; the other executor having renounced his appointment. The testatrix by separate articles of her will created five separate and distinct trusts in her executors, each of 247 shares of the capital stock in the Brooks Locomotive Works, a corporation located at the city of Dunkirk, in this county, for the benefit of her grandchildren Jesse Brooks Nichols, Marion Brooks Patterson (now Marion Brooks Barlow), Jessie Brooks Patterson (now Jessie Brooks Tyler), Kathleen Stevens, and Gretchen Stevens; each of said grandchildren being the beneficiary of one of such trusts. These trusts are created in identical language, and a reference to the one on behalf of Jesse Brooks Nichols, contained in article 8 of the will, presents the question as to all of them. It reads as follows:

"Article Eighth. I give and bequeath to my executors hereinafter named two hundred and forty-seven (247) shares of the capital stock of the Brooks Locomotive Works aforesaid, to have and to hold the same, in trust, nevertheless, to collect and receive the dividends, issues, and profits thereof, and to apply the same to the use of my grandson Jesse Brooks Nichols in semi-annual payments, or as often as the same shall be declared, paid, or realized, until my said grandson shall arrive at the age of thirty years. When my said grandson shall arrive at the age of thirty years, I direct that the said shares of stock, with any accumulations or earnings thereon, be then transferred to him absolutely. If my said grandson Jesse Brooks Nichols shall die before attaining the age of thirty years, leaving issue born in lawful wedlock him surviving, then and in that event I do give and bequeath such shares of stock with any accumulations or earnings thereon to said issue. If my said grandson Jesse Brooks Nichols shall die before attaining the age of thirty years leaving no issue born in lawful wedlock him surviving, then and in that event I do give and bequeath such shares of stock, with any accumulations or earnings thereon, to my then surviving children and grandchildren, share and share alike; they to take the same per capita and not per stirpes. The provisions of this article shall be subject to the provisions of article thirteenth of this will."

The thirteenth article of the will, referred to, which is to be read into and made a part of each of the said trusts, reads as follows:

"Article Thirteenth. I do further will and direct that my said executors shall not be held liable for any depreciation in the value of the stock of the Brooks Locomotive Works aforesaid, and while I here express the wish that the investment should be maintained in the said stock of the Brooks Locomotive Works as I now hold it, so long as my said executors continue to hold said stock and it seems to them prudent so to do, I nevertheless authorize my said executors or a majority of them to sell and convert the said shares whenever, by reason of any change in the conditions surrounding the business of building locomotives, it shall seem necessary or wise in the judgment of a majority of said executors so to do for the preservation of the principal sum invested, and to reinvest the proceeds thereof from time to time as they may deem prudent and necessary, and in such investments and securities as they shall deem safe and proper. And my said executors shall not be held liable for any loss or depreciation in such investments or securities resulting from any mistakes in judgment in making said investments or purchasing said said securities."

The Brooks Locomotive Works was organized as a corporation under the laws of this state by H. G. Brooks, husband of the testatrix, in the year 1869, for the manufacture of railroad locomotives. The capital stock of the company was fixed at $250,000, divided into 2,500 shares, of the par value of $100 per share, and has ever since remained the same. Upon its organization Mr. Brooks became the president of the company, and remained its president and was its dominating spirit to the time of his death, which occurred in 1887. Prior to the death of Mr. Brooks the company had become solvent and prosperous, and at that time was a prosperous business concern, although at various times during its existence it had passed through great business depressions. Upon the death of Mr. Brooks the majority of the stock of the company passed to the testatrix, and by virtue of her ownership of such stock the control of the corporate affairs of the company rested in her hands, and so continued until the time of her death in November, 1896. The prosperous condition of the company which existed at the time of the death of Mr. Brooks continued down to the death of the testatrix; the company shortly thereafter paying a dividend of 15 per cent. upon its capital stock from earnings for the period of six months ending October 31st preceding her death, and leaving a large amount of accumulated surplus earnings still on hand. Prior to the time of making her will and the death of the testatrix in 1896, there began a new era in locomotive building, and thereafter the business of the company was greatly increased. The demand of railroad companies for engines of a heavier type, the position of the company, with its superior equipment, to meet these demands, enabled it to enormously increase its output and earnings, and this condition continued to the time when the business and tangible property of the company were sold in the year 1901, and it went out of business. In fact, during this period, the company experienced the greatest prosperity it had ever attained.

At the time of the death of the testatrix the book value of the assets of the company, after deducting all indebtedness, amounted to $1,791,708.59, according to the inventory taken by the officers

of the company shortly prior thereto, which is the only evidence upon the subject, and which all parties agree may be considered as the basis of value of such assets at the time of her death. This amount was made up of $1,093,345.78, value of plant, equipment, and materials, and $698,362.81 of cash, bills receivable, etc., of which $418,492.50 was represented by invested surplus earnings, and in the balance of cash, bills receivable, etc., was concededly included the working cash capital used in the conduct of the business. But this amount does not include as an element of value the good will, franchise, rights, or dividend-earning power of the company as a prosperous business concern. The capital stock of the corporation held by the respective shareholders stood as the representative of these assets, and, had the corporation been dissolved at that time, all of such assets would have been distributed to the shareholders of the stock in proportion to the number of shares held by each; and this, irrespective of whether the amount distributed represented capital of the corporation or accumulated earnings, and also irrespective of the question as to the rights of life tenants and remaindermen in the division of said assets when paid over on the respective shares.

The position of the special guardian for Jesse Brooks Nichols is that the proportionate part of the value of the plant, equipment, and materials, and necessary working capital of the company, represented by the trust shares, forms the basis of the trust estate, and that the remainder, representing invested accumulated earnings, should pass to the life tenants as "dividends, issues, and profits" under the terms of the trust; or, put in the concrete form of figures, his position is that from the cash on hand, bills receivable, etc., should be deducted and paid over to the life tenants, as "dividends, issues, and profits," the invested accumulated earnings of $418,492.50, leaving a balance of $179,870.31 as working capital, which, together with $1,093,343.78, the value of the plant, equipment, and materials, altogether $1,373,216.09, constituted the original capital of the trust estate. It is significant, however, that from this so-called working capital was, shortly after the death of the testatrix, deducted a dividend of 15 per cent. upon the capital stock of the corporation and paid over to the life tenants as earnings of the corporation for six months' operation expiring October 31, 1896, preceding the death of the testatrix.

The position of the special guardian for the Stevens children is that the appraised value of the stock, constituting the several trusts, at $450 per share at the time of the death of the testatrix, constituted the value of the corpus of the trust estates, and that the value of all the other assets of the corporation at the time of her death, represented by the stock constituting the basis of the trust estates, must be deemed to belong to the life tenants as "dividends, issues, and profits" under the terms of the trust. Treating the entire capital stock of the company as constituting the trust estate, for the purpose of illustration, this position presents these conditions: The appraised value of the stock at $450 per share would amount

to $1,125,000. The value of the plant, equipment, and materials amounts to $1,093,345.78. The difference between the two items would be $31,654.22, which would represent the working cash capital of the company included in the appraised value of the stock—an amount concededly insufficient to carry on the business. This amount would have to be deducted from the cash, bills receivable, etc., on hand as per the inventory. Deducting this amount from such cash, bills receivable, etc., would leave a balance of $666,708.59 belonging to the life tenants; and this, without any change whatever in the conditions existing relative to the estate, or relative to the corporate affairs, at the time of the death of the testatrix—the creation of the trust.

The discrepancy and fallacy of this position can be more readily illustrated by putting a supposed case, deducible in reason from the state of affairs existing. Suppose that prior to the death of the testatrix $500,000 of the accumulated earnings of the company had been used and expended by the directors of the company in improvements and betterments of the plant, the purchase of new machinery, tools, and additional materials. It is perfectly apparent that the value of the assets of the company would have remained the same, but simply changed as to form. We then would have as a result inventory value of plant, equipment, and materials. $1,593,-345.78; working capital, represented by cash, bills receivable, etc., on hand, $198,362.81. Now, if we take from this $1,593,345.78, the value of the plant, equipment, and materials, the $1,125,000. appraised value of stock at $450 per share, this would leave $468,-345.78 of the capital of the corporation, composed, not of surplus earnings, but of plant, equipment, and materials, and appropriate it to the benefit of the life tenants—a condition not appealing to the sense of justice.

It will be borne in mind that the only appraisal made of the value of the stock at the time of the death of the testatrix was for the purpose of ascertaining its value, upon which to base the inheritance tax payable on the transmission of the property; and the evidence given upon that subject was by officers of the company closely associated with and related to the deceased, one of whom was Mr. Stevens, one of the trustees accounting in this proceeding. This appraisal was not for the purpose of ascertaining the value of the property as constituting the basis of the trust estate, but was the value placed upon the corporate shares of the company standing as the representative of its entire assets. It seems hardly credible that the shares of stock of this company should be worth only at the rate of $450 per share, representing in the aggregate $1,125,000 in value, for the entire capital stock, when the net assets of the corporation exceeded that amount by $666,708.59; and no court, in determining the rights of life tenants and remaindermen in a trust composed of such corporate stock, should consider itself bound by any such appraisal, with such an apparent discrepancy existing, the effect of which might well be to change principal to income.

Looking behind the trust shares themselves, in view of the subsequent sale of the corporate property represented thereby, I am of the opinion that the position of neither of the special guardians is correct as to what constituted the original basis of principal of the trust estate in this case. It was held in Matter of Kernochan, 104 N. Y. 618, 11 N. E. 149, and the holding approved in Lowry v. Farmers' Loan & Trust Company, 172 N. Y. 137, 64 N. E. 796, that accumulated surplus earnings of a corporation, which accrued prior to and existed at the time of the creation of a trust composed of capital stock of a corporation, and subsequently paid over as dividend earnings by the directors of the company, belonged, as between the life tenant and the remainderman, to the life tenant as income. In this case practically all of the surplus earnings which existed at the death of the testatrix and the creation of this trust have since been received by the trustees and paid over to the life tenants as income, and such application of such earnings is not questioned in this proceeding. Upon the whole, in view of the holding of the Kernochan case supra, I am satisfied that the true basis of the corpus of this trust estate was the proportionate value of the plant, equipments, and materials of the company, represented by the shares of stock constituting the several trusts, together with the proportionate amount of the working cash capital necessary to carry on its business (stipulated to be $70,000), aggregating $1,163,345.78, and the balance thereof, $628,352.81, which was subsequently distributed as surplus earnings, went to the life tenants under the terms of the trust.

On the 20th day of June, 1901, the Brooks Locomotive Works sold its entire plant, equipment, and materials to the American Locomotive Company, pursuant to an option contract made between said companies on the 4th day of May, 1901, for the sum of $6,626,837. Of this amount $1,126,837 represented the price paid for materials, based upon their cost price to the vendor, and $5,500,000 represented the price paid for the plant and equipment, including as an element, however, all "patents, patent rights, licenses, trade-marks, trade-names, rights, goodwill, privileges, and franchises" of the Brooks Locomotive Works. The bill of sale, as a part of the consideration, stipulated that the vendor and its officers should not, during the period of ten years from the date thereof, within a radius of 2,000 miles of the city of Dunkirk, directly or indirectly engage in, or become interested in any manner, or permit their names to be employed in carrying on the business of manufacturing locomotive engines, except in connection with the American Locomotive Company, the vendee, or its assigns. This provision was doubtless inserted pursuant to the stipulation of the option contract of May 4th preceding, which provided that the Brooks Locomotive Works should presently, after such transfer, be legally wound up and dissolved, or that all its capital stock should be turned over absolutely to the purchaser, and also contained the same stipulation relative to the officers of the company becoming engaged in the manufacture of locomotive engines for the period of ten years. While the terms of the bill of sale are apparently not as broad as the option contract, it

was doubtless the understanding that the Brooks Locomotive Works should go into liquidation, and shortly after such transfer it proceeded to do so.

The book value of the materials at the time of the death of the testatrix, as shown by the inventory made a few days previous, was $345,193.35, whereas the value of the materials at the time of such sale was $1,126,837, showing an increase in amount of materials, in the interim between the death of the testatrix and the sale of the plant, of $781,643.65. The inventoried value of the plant and equipment, according to such inventory in 1896, was $748,152.43, whereas it was sold for $5,500,000, or at an increased price of $4,751,847.57. Included in this increased price is the sum of $533,410.57, which represents betterments and improvements to the property, new tools, machinery, etc., made and purchased in the interim between the death of the testatrix and the time of sale. Neither of these inventories, however, included as elements of value "patents, patent rights, licenses, trade-marks, trade-names, rights, good will, privileges, and franchises" of the company, which were included in the sale of the plant and equipment to the American Locomotive Company. There is no evidence in the case to indicate what part of this increase over the inventoried value of the plant and equipment was due to the rise in value of the real estate; but from the evidence in the case the fair inference is that substantially all of it is to be accounted for by way of betterments, which were paid for out of the surplus earnings of the company, and for all practical purposes of this case it may be so treated. We then have this condition of affairs: The purchase price of $6,626,837 was made up as follows: $1,093,345.78 was represented by the value of plant, equipment, and materials of the company at the death of Mrs. Brooks; $781,643.63 by increase in amount of materials; $533,410.57 by betterments; and $4,218,437 as representing the price received upon the sale for "patents, patent rights, licenses, trade-marks, trade-names, rights, good will, privileges, and franchises" of the company, not included as an element of value in any of the inventories, which, for convenience's sake, we may speak of as the good will of the business.

It should be borne in mind in this connection that no new capital was invested in the business between the death of the testatrix and the time of sale, and that all betterments and the increase in the amount of materials were paid for out of the earnings of the company. Reduced to proportions, the 1,235 shares, constituting the trust estates under the will of the testatrix, represents $2,083,907.88 of the price received for the good will of the business, $263,504.82 of the amount expended from the earnings in betterments, and $386,131.96 of the increased amount of materials on hand at the time of sale, paid for out of the earnings of the company. It is with those three items that we have to deal in connection with the disposition of this case.

It is contended by the special guardians that these various amounts, under the circumstances of this case, in consequence of the sale of the corporate property and the dissolution of the corporation,

represent "dividends, issues, and profits" arising from the shares of
stock held in trust under the will of testatrix, and are payable to
the life tenants; whereas, upon the other hand, it is claimed that
these various amounts constitute a part of the capital of the trust
estates, and should be held by the trustees to await the final distribu-
tion of the corpus of the estate among those who, at the time of distri-
bution, will be entitled to take as remaindermen. The question pre-
sented in this case is which of the two contentions is correct. These
various trusts terminate when the respective grandchildren, for
whom they are created, arrive at the age of 30 years. In stating the
case we have used the terms "life tenants and remaindermen."
While these terms are not strictly accurate in this connection, yet
for convenience's sake we will consider the grandchildren before
reaching the age of 30 years as life tenants, and after arriving at that
age, or, in the event of their death prior to such time, those who will
succeed to the trust estate under the will, as remaindermen, because
the principles applicable in this case are the same as those applica-
ble in the case of life tenancies, and by so doing a confusion of terms
will be avoided.

The cardinal rule in the interpretation of wills is to arrive at and
give effect to the intention of the testator, where such intention may
be carried into effect without violation of law; but this intention is
to be derived from the context of the will itself, viewed in the light
of all the surrounding circumstances. The testatrix in this case
owned·a majority of the capital stock of the Brooks Locomotive
Works, and by virtue of such ownership, through officers elected on
vote of such stock, had been in control of and managed its affairs
and shaped its policy for the period of nine years immediately pre-
ceding the making of her will and the time of her death. It is ap-
parent that it was part of this corporate policy to retain from its
earnings a liberal surplus, in addition to its necessary working cash
capital, and invest and hold the same to meet any unusual demands
of the business and to use liberally from such earnings for better-
ments and improvements to its plant and equipment; for we find
that at the time of her death the assets of the company had accumu-
lated to a value of more than seven times its capital stock, represented
principally, if not wholly, by betterments, materials, ·cash, and bills
receivable. It was with full knowledge of this corporate policy, a
policy sanctioned and followed, if not actually inaugurated, by her-
self, that the testatrix made her will creating these several trusts
from the capital stock of the company. The context of the will
clearly shows that it was her purpose and intention that these shares
of stock should continue to be held as the capital of the trust estate
during the continuance of the respective trusts, and, when the period
of distribution arrived, be turned over in kind to those entitled to
take as remaindermen. With this dominant idea in mind she di-
rected her executors to collect, receive, and apply the "dividends,
issues, and profits thereof" to the use of the life tenants "in semian-
nual payments, or as often as the same shall be declared, paid, or
realized."

I am of the opinion that, as thus far used in this testamentary scheme, the words "dividends, issues, and profits" relate simply to earnings of the company, to be paid over to the trustees by officers of the company in the form of dividends upon the shares of capital stock held in trust, and have no greater or other meaning than the term "income" would have had, if employed in their stead. As employed they are simply interchangeable terms, meaning "income" upon the trust estate derived from dividends declared by the directors of the company from surplus earning. Nor is there anything in the other provisions of the will which indicates to my mind that they were employed in any other sense or should be given any other significance. True, the will authorizes the executors to sell the shares of stock constituting the several trusts; but this authority was conferred, as stated, for the purpose of the "preservation of the principal sum invested," and not for profits which might be realized upon a sale thereof, or for speculative purposes. Then it provides that the "proceeds thereof" of the sale are to be invested for the purposes of the trust. Clearly the language "proceeds thereof," as used in such connection, admits of no separation or division of such proceeds on the basis of principal and profits, and every expression of the will breathes a negative of any intention to clothe the executors with authority to speculate with the trust funds for the purpose of realizing profits. Nor is any different significance to be attributed to the words "dividends, issues, and profits" than that of "income" from the trust estate, in the directions to apply the same to the use of the life tenants "in semiannual payments, or as often as the same shall be declared, paid, or realized." These words, as here employed, relate to the time of payment, and not to the character thereof. This conclusion is regarded as in accord with the holdings of the court, in respect to similar language, in the case of Stewart v. Phelps, 71 App. Div. 91, 75 N. Y. Supp. 526, affirmed on opinion below in 173 N. Y. 621, 66 N. E. 1117.

It is not my purpose to enter into an extended discussion of the conflicting and seemingly irreconcilable authorities, involving questions having a greater or less bearing upon the questions at issue; but it may serve a useful purpose to refer to a few of the more recent decisions by the courts of our own state, claimed by the respective parties to have a bearing, as precedents, upon the positions taken. In the case of Matter of Kernochan, 104 N. Y. 618, 11 N. E. 149, the trust was to receive the rents, issues, and income of certain property set apart in trust, and apply the net amount of such rents or income to the use of the widow of testator for life, the remainder to go to daughters of testator or their issue. Constituting part of the trust estate was 5,000 shares of the capital stock of the Panama Railroad Company, inventoried at $100 per share par value, $275 per share market value, and $1,375,000 assessed value. A dividend of $25,000, representing profits or earnings, was declared on this stock April 14, 1881, payable May 2, 1881. The testator died intermediate these dates on April 20, 1881. The life tenant claimed this dividend as income. The court held that the dividend was not income payable

95 N.Y.S.—20

to the life tenant, but represented an indebtedness owing the estate by reason of its having been declared before the death of the testator, and that all the life tenant had the right to claim was the income on dividends declared after the commencement of the tenancy. The executors, with other stockholders, sold their stock to another company for $250 per share, including an interest in a sinking fund created from savings for payment of debts, for which a ratable proportion, equivalent to $15.74 a share, was paid to the stockholders. Held, that this latter amount was part of the price for which the stock was sold, and was properly credited to principal and belonged to the remaindermen. Following the death of the testator the company also declared a dividend of $24.26 upon each share of the capital stock, more than three-fourths of which represented an accumulation of earnings prior to the death of the testator. Held, that it was all properly carried to income and belonged to the life tenant, and no apportionment was proper.

In the case of McLouth v. Hunt, 154 N. Y. 179, 48 N. E. 548, 39 L. R. A. 230, the testatrix died in September, 1888, and the trusts created were to pay over the income to the respective grandchildren until they attained a certain age, then to pay over to them the principal of the trust fund, but, in the event of death before attaining the specified age, then principal to go to others. Included in the trust, set apart by directions of the surrogate, were 254 shares of the capital stock of the Western Union Telegraph Company, upon which the trustees received a stock dividend of 10 per cent. November 10, 1892, in the form of 25⁴/₁₀ additional shares of stock. This dividend was declared out of surplus earnings of the company, accumulated for almost ten years, or six years before and four years after the death of the testatrix. The question involved was whether this stock dividend was income or capital of the trust estate. The court held it to be income belonging to the life tenants.

In the case of Lowry v. Farmers' Loan & Trust Company, 172 N. Y. 137, 64 N. E. 796, the testator had set apart one-fourth of his residuary estate in trust "to apply the rents, issues, and profits" thereof to the use of his widow until death or remarriage, with remainder of the corpus of the trust estate over. Eight shares of stock of the Pullman Car Company formed a part of the capital of the trust. A dividend of 50 per cent. upon the capital stock of the company was declared in the form of stock certificates from accumulated surplus earnings. The question was whether this dividend was "rents, issues, and profits," belonging to the life tenant, or whether it belonged to the remaindermen as a part of the corpus of the trust estate.

The court held it to be income belonging to the life tenant, following McLouth v. Hunt, 154 N. Y. 179, 48 N. E. 548, 39 L. R. A. 230, and approving Matter of Kernochan, 104 N. Y. 618, 11 N. E. 149. The court says, in discussing the question, that:

"In approaching the consideration of such a question, the language in which the gift is made to the beneficiary of the trust, or the life tenant of the estate, must be regarded in order to determine preliminarily the compre-

hensiveness of the testator's intention with respect to the enjoyment by the object of his bounty of the yield of the intermediate estate. Then the transaction through which the property of the corporation is being distributed in the extraordinary form of a stock dividend is to be looked into, in order that its true nature may appear and that a determination may be reached whether capital, or an accumulation of profits of the capital, is being divided among the stockholders."

In Stewart v. Phelps, 71 App. Div. 91, 75 N. Y. Supp. 526, affirmed on opinion below in 173 N. Y. 621, 66 N. E. 1117, after making provision for his wife and grandchildren, and providing for the payment of certain portions of the corpus of the estate at stated intervals to his daughter, the testator by the fourteenth clause of the will gives the remainder of his estate to trustees, "to take, receive, hold, collect, manage, invest, and reinvest the same, and the net rents, income, issues, and profits thereof to pay over to his daughter semiannually during her natural life." Constituting part of the trust estate were bonds, stocks, and securities which were duly appraised. Subsequently the trustees sold a portion of these securities for reinvestment, realizing an increased price over the inventory value of nearly $400,000. The trustees also from time to time reinvested the estate in other securities, some of which were thereafter sold, realizing a profit on the sales of about $130,-000. The executors also invested a portion of the trust estate in 1,325 shares of the Chicago & Alton Railroad Company, and the company gave the stockholders a right to subscribe to an increase of the company's capital stock. Upon an increase of the capital stock of the company this right was sold, realizing a profit of about $6,000. The trustees also received from the executors of the estate 200 shares of the capital stock of the Western Union Telegraph Company which belonged to the testator prior to the time of his death. The directors of the company increased its capital stock and declared a stock dividend of 10 per cent. upon the amount of the stock before the increase, which represented net earnings of the company, which theretofore had been appropriated and used for the purchase of new lines and other capital purposes. The question presented was whether these various sums, realized by the trustees, belonged to the life tenant, or whether they constituted a part of the capital of the trust estate. The case was tried before a referee, and the referee held that the several amounts were accretions to the principal of the trust fund to which the life beneficiary was not entitled. The court discusses the meaning of the terms "rents, income, issues, and profits," and holds that, as used in the will, they indicate an intention on the part of the testator to give to the life beneficiary only the annual income received from the estate, and that this right is not affected by the broad power of investment given to the trustees by the codicil to the will, which is similar to the power conferred upon the trustees in this case. The court then said:

"In investments of this character there is always a possibility of loss, as well as gain, and it is contrary to that purpose for which a trust fund is created to allow an increase in the value of the securities in which the fund is

invested to be paid to the living beneficiary, where no provision is made for such a repayment in the event of any loss which may be sustained by reason of unfortunate investments. It cannot be claimed that, had there been a decrease in the value of the securities turned over by the executors to the trustees as part of this trust estate, the life beneficiary would be liable to make good to the estate a loss; nor could it be claimed that, had the trustees made investments that turned out disastrously to this estate, the life beneficiary would be bound to make good a depreciation in the value of the securities in which the fund had been invested. That the investments of this estate have shown a remarkable increase in value, and that the trustees by wise and judicious management have increased the value of the estate by reason of investments that they have made, would not justify the court, without the explicit direction of the testator, in decreeing that such an increase be paid to the living beneficiary, when the future may show a depreciation in the value of other securities in which the trust estate is invested, and which would deplete the trust which it was evidently the intention of the testator should be preserved for the benefit of his daughter during her life, and for the benefit of her children and the other members of his family after her death."

The case of Matter of Rogers, 161 N. Y. 108, 55 N. E. 393, presents in its surrounding circumstances a state of facts very similar to those in this case. The testator died in 1868, leaving a last will and testament in which he created three separate trusts for the benefit of his children during their lives with remainders to their issue. Composing a part of each trust estate were shares of the capital stock of the Rogers Locomotive & Machine Works. The capital of the corporation was $300,000, represented by 3,000 shares of the par value of $100 each. At the time of testator's death these shares of stock were appraised at $125 per share. The corporation continued business until 1893, paying dividends of from 10 to 20 per cent. on its capital stock, when the plant, equipment, materials, and good will of the company were sold for $2,750,000, to be paid in the stock of a new corporation known as the Rogers Locomotive Company, whose capital stock was $3,000,000, represented by 30,000 shares of stock of $100 per share. The stock of the new company was divided among the stockholders of the old company in ratable proportions. After making the sale the Rogers Locomotive & Machine Works remained in possession of other assets amounting to about $3,000,000, which represented surplus earnings, invested and uninvested. It was held by the court that this $3,000,000 of accumulated surplus earnings represented profits as to which the life tenants were entitled to their proportionate share. After effecting the sale the company went into liquidation. The court further held that after such sale the directors had no power to determine questions arising between remaindermen and life tenants, that such power devolved upon the courts, and that the directors had only power to convert the assets into money and divide among the stockholders, and hence the rights of the parties were not dependent upon any corporate act.

From these authorities certain questions and principles which are of material aid in disposing of the questions at issue, may be regarded as settled: By the McLouth and Lowry Cases, that whether moneys on property, arising from corporate sources, paid over upon shares of stock constituting a trust estate, is to be treat-

ed as income belonging to the life tenant, or as constituting a part
of the capital of the trust estate, will be determined by the court,
irrespective of any characterization or action on the part of the
officers of the corporation in paying it over. By the Kernochan,
McLouth, and Lowry Cases, that dividends paid over upon shares
of stock, constituting the trust estate, from earnings of the com-
pany, in the form of stock certificates, is to be treated as income,
and not capital, as between life tenants and remaindermen. By the
Kernochan and McLouth Cases, that dividends paid upon shares of
stock constituting a trust estate, during the continuance of the trust,
from surplus earnings of the company accumulated prior to the
creation of the trust, will, unless restricted by the terms of the will,
be treated as income payable to the life tenant. By the Stewart
Case, that the price received from sale of shares of capital stock,
constituting a trust estate, in excess of the value of such shares
at the time of the creation of the trust, is to be deemed an accre-
tion to the capital, and go to the remaindermen; and likewise that
the price received for investment securities, in excess of the
amount paid therefor by the trustees, is also to be treated as an
accretion to the capital and as belonging to the remaindermen,
under the terms of a will which creates a trust "to take, receive,
hold, collect, manage, invest, and reinvest" the trust estate, and
pay over the "net rents, income, issues, and profits thereof" as
directed by the terms of the will. By the Rogers Case, that earn-
ings of a corporation accumulated prior to its dissolution and sub-
sequently paid over on shares of stock constituting a trust estate
is to be deemed "profits" belonging to the life tenant, under a trust
similar to the one under consideration.

In all these cases is the principle recognized that the intention
of the testator in creating the trust should be arrived at and carried
into effect, where it may be done without violation of law; and in
so doing courts will regard the substance and disregard mere
matters of form for its accomplishment. Each case must, there-
fore, depend to a greater or less extent upon its own peculiar cir-
cumstances. In the proportionate part of the assets of the com-
pany represented by the shares of stock held in trust is included
the items in controversy, of increased amount of materials, better-
ments, and good will of the company. None of the cases referred
to, however, decide the precise question in controversy in this pro-
ceeding, which is whether these items are to be treated as income
or accretions to the capital of the trust estate.

It was concededly within the corporate rights of the Brooks Lo-
comotive Works, as a going concern, to use a portion of its surplus
earnings for improvements and betterments to its plant, and for
the purchase of an increased amount of materials made necessary
by its increase and growth of business. There is no evidence in
this case, and no claim made, that the amount invested in materials
or expended for betterments or improvements was excessive or
unusual, or more than the necessities of the business required;
and, when we take into consideration that between the death of

the testatrix and the time of the sale the annual output of the company had increased nearly five-fold, and that during that time it had paid, from current earnings, dividends of 290 per cent. upon its capital stock, and had accumulated earnings in addition thereto amounting to $1,424,034.82, the amount expended for these purposes would seem to be reasonable in amount and in accord with the same policy pursued by the corporation when under the directions of the testatrix.

In the course of the discussion in the Rogers Case of the question as to whether accumulated earnings distributed after dissolution of the corporation belonged to the life tenants or were a part of the capital of the trust estate, Haight, J., says (page 113 of 161 N Y., page 394 of 55 N. E.):

"In a manufacturing business a plant is of first importance, and as the business increases an enlargement thereof, with the necessary tools, fixtures, and machinery, is one of the things to which the earnings of the company may properly be devoted. This must be deemed to be fairly within the contemplation of the testator in creating the trusts · with the capital stock of this company. After the plant there arises a necessity for raw material and labor to manufacture it. This requires what is usually termed a working capital, and it, of necessity, varies in amount, depending upon the magnitude of the business. It must, therefore, also have been within the contemplation of the testator that a reasonable amount would be retained by the directors for this purpose."

While what was said by the learned judge in that case with respect to the use of earnings for betterments and purchasing additional materials may not have been strictly necessary in disposing of the question there at issue, it nevertheless shows the trend of judicial opinion respecting the questions now under consideration, and exactly comports with the scheme and intention of the testatrix in creating the trusts in question. She was in control of the affairs of the company. She must be presumed to have known at the time of making her will of the increasing demands of railroads for locomotive engines and that an expansion of the business of the company was imminent. In fact, she had prepared for it by sanctioning the purchase of improved equipments and betterments to the plant. She was entirely familiar with the policy of the company in appropriating liberally from its earnings for betterments and increasing its business capacity and working capital. In fact, it was her own policy. As a result of such policy the plant equipment and materials represented, at the time of her death, more than four times the amount of the capital stock of the company, and the materials on hand alone more than one and one-third times this amount. Every expression in the will breathes a purpose and expectation of the continuance of the same policy during the period of the trust. It is clearly apparent from its context that it was her expectation that accumulated earnings should be used for betterments and increased working capital needed in the business, and that the proportionate part, represented by the trust shares, of what was so used, should be deemed an accretion to the capital of the several trusts and pass to the remaindermen.

The language of the will in the several articles constituting the trusts, and in article 13 relative to the turning over of the trust estate to the remaindermen, "with any accumulations or earnings thereon," is sufficiently broad and comprehensive to embrace the earnings so appropriated, used, and capitalized.

The testatrix was well aware that a business enterprise of this character and magnitude could not long remain stationary; that it must progress or retrograde; that the value of its plant, equipment, and working capital changed in form or amount almost daily. It was with full knowledge of these conditions that she made her will, and in and by the same expressly relieved her executors from liability from loss by depreciation in the value of the stock constituting the several trusts; and to meet such conditions and contingencies she authorized a sale of the trust shares by her executors "whenever, by reason of any change in the conditions surrounding the business of building locomotives, it shall seem necessary or wise * * * so to do for the preservation of the principal sum invested," and, upon the other hand, provided that "accumulations or earnings" not theretofore distributed should pass to the remaindermen with the corpus of the trust estate. The question is not raised, and hence it is unnecessary to discuss it, whether accumulated earnings not employed in the business at the time of sale and dissolution should be credited to the capital of the trust estate or be distributed to the life tenants under the terms of the will. It is sufficient to say that a clear distinction may well exist in the fact of its nonemployment as a part of the necessary working capital of the company.

Before leaving this branch of the case I desire to refer to another phase of the question which impresses me as having great force and leads to the same conclusions, yet along different lines. The will of the testatrix gave to the executors power to sell the shares of stock held in trust, but conferred no authority to consent to or negotiate a sale of the corporate property or business. This power they obtained, if at all, by the fact of their trust ownership of the stock. As already stated, these trust shares stood as the representative of their proportionate part of all the assets of the corporation, including accumulated earnings, as well as the plant, equipment, materials, etc.; or, in other words, these trust shares not only represented the items in question, arising from the sale of the plant, equipment, materials, and good will, but also represented a proportionate share of undistributed earnings. Now, suppose that, instead of selling the plant, equipment, materials, and good will of the company, the shares of capital stock of the company had been sold for a price proportionately larger to cover the surplus earnings not included in the sale; what would have been the effect respecting the amount received upon the shares in question as between the life tenants and remaindermen? Every dollar of it, under the authority of Stewart v. Phelps, supra, would have to be credited to the capital of the trust estate. Again, suppose that the surplus earnings had been distributed, and there-

after the shares of the capital stock had been sold and transferred at the price which was received from the American Locomotive Company; the proportionate share thereof represented by the trust shares in this case would have equaled the items in question, plus the original trust capital, and there can be no doubt that the amount so received, under the authority of the Stewart Case, would have to be credited to the capital of the trust estate. The stipulated facts in this case show that these trustees, by virtue of their holding the trust shares, and others in their own right, constituting a majority of the stock, were in the actual control and management of the affairs of the company from the death of the testatrix to the time when the property and business was sold, and Mr. Stevens was acting as president of the company. For aught that appears the deal could have been consummated through a sale and transfer of the stock, equally as well as a sale of the property and business, increasing the price to represent the accumulated earnings, or distributing the latter before transferring the stock and receiving the amount which was paid. Certain it is that the property and business of the company could not have been sold without the consent of these trustees, because, without their consent, the consent of the requisite two-thirds of the capital stock of the company, necessary to consummate the sale, could not have been obtained. It would seem, however, that Mr. Stevens, one of these trustees, as the president of the company, was the dominating spirit in consummating the sale. Now, the contract of sale of May 4, 1901, left it optional with the vendor to transfer the stock to the vendee or to effect a dissolution of the corporation. The latter course was pursued. Had the stock been transferred in accordance with the right so to do, instead of going into dissolution, the transaction might technically have been a sale of the property and business of the corporation, carrying with it the stock, instead of a sale of the stock, carrying with it the property and business—a distinction without a difference. It would seem that the question respecting the rights of parties to the items of betterments and increased amount of materials, if the contentions of the special guardians are correct, is thus made to depend upon the mere form of sale and transmission of the property by the trustees. In other words, had the trustees sold the shares of stock constituting the trust estate, the amount received would be credited to capital; but inasmuch as they sold the corporate property, represented by the shares of stock, it should be carried to income account and be paid to the life tenants. This same condition of affairs existed and was condemned in principle in McLouth v. Hunt, supra, and in Lowry v. Farmers' Loan & Trust Company, supra, respecting corporate acts which gave rise to the rule, already referred to, that the courts in such cases will determine for themselves the proper disposition of the funds.

For the reasons stated I am satisfied that the items of betterments and increased materials constituted a part of the capital of the trust estate and have been properly credited thereto by the trustees.

Much that has already been said respecting the items of betterments and materials, and especially what was said respecting the form and manner of sale, applies with equal force to the item of $4,218,437, which, in the view taken by me of the matter, may be considered as representing the price received for the good will and franchise rights of the company—a proportionate part, or $2,083,907.88, of which is represented by the trust shares.

Before passing to the consideration of this question, however, it is proper to note that this item includes the amount received for "patents, patent rights, licenses, trade-marks," etc., owned by the company at the time of sale, and the proportionate part of the item in question represented thereby (if good will and franchises of the company are to be treated as income, or "dividends, issues, and profits," under the language of the will), would have to be separated therefrom, because clearly such patent rights, etc., are assets of the company, and are not income, or "dividends, issues, and profits," or the representative thereof, from any evidence appearing in this case. Such separation would be impossible of accomplishment, as no evidence of the value thereof has been given, and for aught that appears such value may represent the full amount of the item in question. However, in the view taken that the price received for the good will and franchises of the company is not to be treated in this case as income, or "dividends, issues, and profits," it is unnecessary to spend any time in dealing with this feature of the case, and, for the purpose of disposing of the question, we may treat the whole amount of the item as representing the price received for the good will and franchise rights of the company.

An examination of a few of the authorities (People ex rel. A. J. Johnson Co. v. Roberts, 159 N. Y. 70–76, 53 N. E. 685, 45 L. R. A. 126; People ex rel. Union Trust Co. v. Coleman, 126 N. Y. 433–437, 27 N. E. 818, 12 L. R. A. 762; People ex rel. Wiebusch & H. Co. v. Roberts, 154 N. Y. 101, 47 N. E. 980; People ex rel. U. S. A. P. P. Co. v. Knight, 174 N. Y. 475, 67 N. E. 65, 63 L. R. A. 87; Boon v. Moss, 70 N. Y. 465–473) having a bearing upon the question of corporate franchises and good will very clearly points out the peculiar characteristics of this class of property in connection with a corporate business enterprise. Without attempting elaboration or unnecessary preciseness of definitions, these cases hold that a "franchise" is the right or privilege to exist and do business as a corporation, or, as said in the Coleman Case, supra, it may be deemed "its business opportunity and capacity," and "good will" is the reputation of an established business. Both are intangible assets of the corporation. Neither is a part of its working capital. Both are represented by the share stock held by its stockholders. Both are dependent upon the corporate existence, and "good will" can only exist in connection with an existing and going business. Both are appurtenant to the corporation as such, and have no independent existence apart from it. Both constitute elements of value in connection with, but not apart from, the corporation and its business. These considerations, to my mind, lead irresistibly to the conclusion that

the proportionate part of the price received upon this sale by the Brooks Locomotive Works for the value of its franchise rights and good will represented by these trust shares must be treated as an accretion to and as constituting a part of the capital or corpus of the trust estate, and no part thereof can be held to be income, or "dividends, issues, and profits," distributable to the life tenants.

It may be true, as contended, that the item represents "profits" received; but it is profits arising from the investment and as a result of the growth of the business, and not income arising from earnings as a result of the operation of the plant, which was the "dividends, issues, and profits" intended by the testatrix to be paid over to the life tenants. Furthermore, if the fair interpretation of the will required the payment to the life tenants of the profits realized from a sale of the good will (including franchises), it would mean the amount realized therefor on the sale in excess of its value at the time of the creation of the trust; because, if the price received was to be paid over, it would not represent profits, but the value of the thing itself, and clearly this was not contemplated by the testatrix. Now, there is nothing in this case from which the amount of profits on good will could be determined, and for aught that appears its value may have been as great at the time of the death of the testatrix as at the time of the sale. Certain it is that it must have been of considerable value at that time, in view of the then business prosperity of the company, although there is nothing in this case to indicate what it was. Again, the price received does not necessarily wholly represent profits received from a sale of the good will. The value of the plant and equipment may have been considered worth more than previously estimated, and it is very apparent that the company was the strongest competitor of the vendee, and it may well be that the purchaser was willing to pay liberally for the property and the dissolution of the company, for the purpose of avoiding such competition and to enable it to increase its own earning capacity in consequence thereof. However, in any aspect of the case, I am satisfied that the price received must be deemed an accretion to the capital, and not income or profits, to which the life tenants are entitled under the terms of the trust.

This would dispose of the entire question on this branch of the trust, were it not for the fact that the special guardians contend that the interpretation here given would work an unlawful accumulation of income under the terms of the statute. This proceeds upon the theory that the profits or increased price received upon the sale represents income within the statutory meaning. The position taken is that the price paid for good will represents anticipated profits of the company for years to come, paid in advance; in other words, the present capitalization of future earnings. The will of the testatrix and the terms of the trust do not permit any such action on the part of the trustees, because under the terms of the trust the income is to be paid over semiannually, or as often as received, and no provision is made by which the trustees are authorized to sell the prospective income on the trust fund for years to come, receive

pay therefor presently, and distribute it to the life tenant.　In fact, such a course could rarely, if ever, be sanctioned by the court. It is possible that the court might, in a proper case, anticipate income on a trust fund for the maintenance of a minor or other dependent; but such a course could not be authorized except under pressure of necessity, and never if by so doing the provisions of the will for remaindermen would be defeated.　Now, assuming (without conceding), as suggested by the special guardians, that the sale price represented the anticipated income on the trust fund for a period of many years in advance, say 20, which would not be an unreasonable supposition in this case, and that such anticipated earnings had been presently paid over to the life tenant, and then suppose that the life tenant had died within the year following such payment; it will readily be seen that in such an event the life tenant will have received 19 years of income, which would pass to his estate, to which he was not entitled under the terms of the trust, and in the present case such an anticipation of income will result in the present payment to the life tenants of income anticipated beyond the period of some of the trusts.　This condition cannot be permitted to exist, unless such a construction of the will is forced, to avoid an unlawful accumulation of income.

Do, then, the terms of this will, or the carrying of the items in question to the capital of the trust estate offend the provisions of the statute (Laws 1897, p. 508, c. 417, § 4) against the accumulation of income?　This statute makes valid the accumulation of the income of personal property "directed by any instrument sufficient in law to pass such property" during the minority of a beneficiary, and "all other directions for the accumulations of the income of personal property * * * are void."　The statute, it will be observed, is aimed against the directions contained in the instrument for the accumulation of income, and not against gains or accretions to the value of the capital of the trust estate arising from causes other than by the addition of income thereto.　There are two sufficient reasons why the contention of the special guardians should be answered in the negative:

First, the statute avoids directions to accumulate contained in the instrument.　The will in question does not contain any directions to accumulate income, either expressly or by inference.　On the contrary, it expressly requires it to be paid over to the life tenants semiannually or as often as received, and hence the statute was not violated.　Livingston v. Tucker, 107 N. Y. 549, 552, 14 N. E. 443.　The directions to transfer the stock to remaindermen at the end of the trust period, "with any accumulations or earnings thereon," do not operate and cannot be construed as directions to "accumulate."　The words may be considered as indicating that the company was expected to continue its policy of using from its earnings for betterments and increasing its business capacity and retain a portion of its surplus earnings to meet business emergencies.　What the testatrix intended was that such "accumulations and earnings" should pass to the remaindermen upon a transfer of the stock at the end of the trust

period. The law would effectuate the same result, had the directions been omitted entirely, because this stock represented the moneys so used and retained, and the same would follow the transfer of the stock without directions. The words are surplusage.

The second answer is that the items in question are not "income," or representative thereof, within the prohibition of the statute against accumulations. Respecting the item representing the price received upon the sale for the franchise rights, good will, etc., of the company, represented by the trust shares, I do not deem it necessary to extend the discussion further than already had in holding the price received therefor to be an accretion to the capital. Suffice it to say that it is difficult to perceive upon what theory the amount received therefor could, under any circumstances, be considered "income" within the meaning of the statute under consideration.

There is this distinction existing between the item of amount received for good will, etc., and the items of amount received for betterments and increased materials: Whereas, the former represented no outlay or investment of corporate funds, the latter were paid for out of the earnings of the company. Had these earnings not been employed for such purposes, they would have been paid over upon the trust shares, and would then have been treated as income; or, had they been retained by the company until the sale and its dissolution, and then been paid over upon the trust shares, the court would have applied them as income under the authority of the Rogers Case, supra, upon the principle that the court will look at the substance of the transaction, disregarding mere matters of form, and will, upon principles of equity, treat as done that which ought to have been done. However, these amounts were not paid over by the company upon the sale and dissolution, and they were not on hand as surplus earnings at that time, but, on the contrary, had been invested in betterments and materials, and were employed by the company in good faith as a part of its working capital, which it had a perfect right to do. The position taken by the special guardians seems to be that, as soon as these earnings, which subsequently went into betterments and the purchase of increased materials, came into the treasury of the company, they represented income to which the life tenants under the terms of the trust were entitled, and that the subsequent employment thereof by the company could not change their character. As already stated, this use of earnings was in accordance with the policy inaugurated by the testatrix, and the policy contemplated by her when she created these trusts, and the amount so used must be deemed an accretion to the capital of the trust estate, unless by so doing the statute against accumulations is offended. I am of the opinion that it was not. Earnings of a corporation—surplus earnings—are not income upon the share stock of a going business concern until distributed and paid over to the shareholders in the form of dividends. While held by the company, before dividends declared, they constitute a part of its capital—not working capital, perhaps, but capital in the form of assets, which it has a right to employ and use for betterments and as a part of its

working capital; in fact, for all legitimate corporate purposes. In the present case the company did so employ and use a portion of its earnings. These items of betterments and materials in question represent a part of the earnings so employed and the amount so used never constituted income, and the carrying of the amount so used to the capital of the trust does not offend the statute.

The proportionate part of the $70,000 of necessary working cash capital, represented by the trust shares, may be considered as represented by the property still held by the corporate officers, and, when paid over, will be retained by the trustees as a part of the corpus of the trust estate. I am firmly of the belief that this disposition of the case is eminently fair to the life tenants. They received the benefits of a large amount of surplus earning accumulated prior to the creation of the trust, and a still larger amount existing at the time of the sale and dissolution, and eventually, if they attain the age of 30 years, which is well within their period of expectancy, they will receive the large increase received from the sale, added to the original capital, and will, in the meantime, receive the income equivalent of the earning capacity of the trust shares. Furthermore, it comports with the intention of the testatrix as nearly as the changed conditions of affairs, not contemplated by her, will warrant. The figures used may be found upon investigation in some respects inaccurate, but all needed corrections can be made upon the entry of the decree.

The only remaining question which it is necessary for us to consider in this connection is whether deductions should be made from the interest received from bond investments to reimburse the principal for premiums paid therefor—in other words, to meet the decrease in the value of such bonds by the wearing away of premiums paid therefor at the time of their purchase. It appears from part 1 of schedule K of the account, that the net amount of premiums paid for investments in bonds was $166,165.69, and it appears from the stipulated facts in the case that the depreciation by wearing away of the premiums paid to the time of the accounting was $9,158. It is now the settled law of this state that, unless a contrary intention appears from the context of the will, construed in the light of surrounding circumstances, proper deductions must be made from the interest received to meet the depreciation of principal on account of the wearing away of premiums paid for the investment securities. New York Life Ins. & Trust Co. v. Baker, 165 N. Y. 484, 59 N. E. 257, 53 L. R. A. 544. This case and the cases of Matter of Hoyt, 160 N. Y. 607, 55 N. E. 282, 48 L. R. A. 126, and McLouth v. Hunt, 154 N. Y. 179, 48 N. E. 548, 39 L. R. A. 230, hold, however, that the converse of this proposition is equally true; that is, that where from the terms of the will, viewed in the light of the surrounding facts and circumstances, it appears that the intention of the testator is that no deduction shall be made from the interest received to meet the wearing away of premiums paid, but that such loss for premiums paid shall be borne by the capital of the trust estate, such intention

must be given effect. Each case, therefore, is made to depend upon its own peculiar circumstances.

In the Baker Case the trust was "to collect and receive the rents, income in dividends, and profits thereof, and apply the same to the use of my said son William during his natural life, and after his death I. give, devise, and bequeath the whole of said share, with all arrearages of income, to the then surviving lawful child or children of my said son William," etc. It will be seen from this language that the primary object of the trust was two-fold —one to secure the income to the son for life, and the other to preserve the capital of the trust intact for the benefit of the grandchildren and their descendants when the life estate terminated; the will expressly providing that the "whole" of the share constituting the trust estate should be paid over to the remaindermen. In this case the trust is "to collect and receive the dividends, issues, and profits thereof, and to apply the same to the use of my grandson [or granddaughter] * * * in semiannual payments or as often as the same shall be declared paid or realized, until my said grandson [or granddaughter] shall arrive at the age of thirty years," then to transfer the corpus of the trust estate to such grandson or granddaughter; their issue, if any, to take in case of death before attaining that age, and, if none, then the surviving children and grandchildren of the testatrix to take in equal shares.

There are several very important distinctions existing between this case and the Baker Case. Here we have a trust created for years, with the expectation and intention that the beneficiary of the income will also take the estate in remainder; whereas, in the Baker Case, a life estate was carved out and the remaindermen of necessity were persons other than the life tenant. The primary object of each of the trusts contained in the will under consideration was solely for the benefit of the grandchildren for whom created, both as respects the income and payment over of the principal of the trust estate. It was the intention and expectation of the testatrix that each grandchild should have both income and principal. The time of turning over the capital was postponed to allow the beneficiary to attain the age of business discretion and judgment before taking charge of so large an inheritance, but that it was the intention that each grandchild should ultimately receive it is clearly manifest. In this testamentary scheme, unlike that in the Baker Case, the provisions for the disposition of the trust fund, in the event of the death of any grandchild before the end of the trust period, was a secondary and incidental consideration. All the children and grandchildren of the testatrix were amply and equitably provided for under the will, and there is manifestly a design on the part of the testatrix that they should not receive any other or further benefits from her estate, save in the event of the accidental falling in of an estate, in case of death, before the final distribution took place. Then there is lacking in this case that explicit direction for the turning over of the "whole" estate which was a characteristic feature of the trust in the Baker Case

The testatrix was apparently a woman of business experience and fully realized that a situation might arise calling for an investment of this large estate by her trustees, and she clothed them with the broadest discretion in its investment; in fact, swept away all barriers restricting trust investments, and left them free to invest the funds in such securities as their judgment should dictate, and at the same time relieved them from all losses which might result therefrom through errors of judgment in making them. She must be presumed to have been cognizant of the fact that in making such investments premiums upon securities would in all likelihood have to be paid, and, had she intended that such premiums should be borne by the interest received from such investments, I am firmly of the belief that she would have said so in unequivocal terms. It is clearly apparent that the testatrix realized that the capital of the trust estate would not remain at a fixed amount, but would fluctuate in value. She conferred authority upon her executors to sell the trust shares to prevent loss by depreciation, and to invest and reinvest the proceeds thereof, but decreed that they should not be responsible if such depreciation occurred, and made no provision for reimbursing the capital of the trust estate for such losses, or for losses occurring by reason of error of judgment in making investments, which would include losses arising from errors of judgment in paying premiums upon investments. Had errors occurred in paying premiums on investments, and the case does not disclose whether there were or not, it is difficult to see upon what principles of equity, under the provisions of the will, the loss could be charged against the interest received, to reimburse the principal therefor. The clause of the will conferring authority to sell the trust shares of stock for the "preservation of the principal sum invested" does not indicate an intention, when read in connection with other provisions of the will, that the corpus of the trust estate should be kept intact, but rather indicates a purpose to confer authority upon the executors to sell the trust shares, if in their judgment such course was advisable for the best interests of the estate.

There is another phase of this question which is worthy of consideration in this connection. It appears from part II of schedule K. of the account that the trustees have invested trust funds in 13,000 shares of the preferred stock of the American Locomotive Company, paying therefor $1,112,962.50, or $180,037.50 less than par. It also appears from the same schedule that they hold as an investment 8,000 shares of the common stock of said company, which cost $200,000 or $25 per share. From schedule D of the account it appears that the trustees also at one time held 4,000 additional shares of the common stock of said company, which cost at the rate of $25 per share, and that these 4,000 shares of such common stock were sold by the trustees, realizing a profit of $33,-420 on the sale, or more than 33⅓ per cent. profits on the investment. At the same rate of increase the common shares of stock now held as an investment would realize an increased profit of upwards of $66,000. From the rise in value of this common stock

it is but fair to infer that the preferred stock of the company has likewise materially increased in value, thus realizing as profits a portion, if not all, of the $187,037.50, the price below par at which the preferred stock was purchased.

The rule which charges the amount paid for premiums upon investments to the interest or income received therefrom is based upon equitable principles. Now, if it is equitable to charge the loss arising from premiums paid against the interest or income received, it would likewise seem equitable that the profits realized from such investments should be used to wipe out those losses. In other words, if the losses on investments are to be charged against the income, it would only be equitable and fair that the profits realized therefrom should be credited thereto, at least to the extent of making good such losses, on principles of equity and equality. However, upon the whole view of the question, I am satisfied that it was not the intention of the testatrix to charge the loss arising from premiums paid upon the interest or income received, but that, on the contrary, it was her intention that such losses should be borne by the corpus of the trust estate; that her intention was that the capital of the trust estate as it existed at the termination of the trust, whether increased or diminished from its original amount in the process of administration, should be transferred and turned over to the remaindermen at the end of the trust period at its then value; and that, when she provided that the trustees should "collect and receive the dividends, issues, and profits thereof, and to apply the same to the use of my grandson [or granddaughter] in semiannual payments, or as often as the same shall be declared paid or realized" she intended that the full income should be paid over, without diminution, except for expenses of administration.

The objecting party has reached the end of the trust period, and is now entitled to her entire share of the corpus of the trust estate. Enormous profits have been made, which, in accordance herewith, are to be carried to the capital of the trust, increasing the original capital of the trust estate many-fold, and upon principles of equity and justice it seems to me that those who may contingently take the capital of the trust estate, in the event of the death of the beneficiary before the end of the trust period, have no just cause to complain because the losses arising from premiums paid on investments are charged against the corpus of the estate.

All other questions which have been raised are of minor importance, and will be adjusted upon the entry of the decree as will also the question of costs to the respective parties, including disbursements.

Decreed accordingly.