CASES DECIDED IN ALL THE

# JUDICIAL DISTRICTS

OF

# PENNSYLVANIA

## VOL. IV.

---

## Leech's Estate.

*Wills — Construction — Life-tenant and remainderman — Principal and income—Proceeds of sale of real estate purchased by executor upon foreclosure proceedings in excess of book value.*

By the third paragraph of his will, testator directed that his wife should have and enjoy *"the rents and income"* of any house which he might occupy at the time of his decease, or if she should prefer it, the possession thereof to be held and enjoyed by her during her natural life for her sole and separate use; and after providing for the sale of the house in case his wife should become dissatisfied with it, and the investment of the purchase money in a suitable residence for her, he directed the same to be "held and enjoyed by her, or *the rents and profits thereof* to be received by her in the manner aforesaid during her life, if she should remain my widow." By the eighth clause of the will, he bequeathed his residuary estate to his executors, in trust "to receive *the income and profit thereof*, to pay the taxes thereon . . . and to pay over one-third of *the net income thereof* in at least quarterly payments to my wife, for and during the term of her natural life . . . the remainder of the *net income and profits thereof*" "to be paid in like manner to my three children, share and share alike, during their respective lives. . . ." with the further direction to pay such part of the income of his estate that any son would have been entitled to dispose of by appointment to such son's widow. The trustees, in the course of their administration, foreclosed two mortgages and bought the real estate in at sheriff's sale; one of the properties cost $26,550, the other $62,093.84. In the schedule of distribution approved by the court, these figures appeared as the book values, and were included as a part of the principal of the estate. The trustees subsequently sold the former of these properties for $125,500, the latter for $132,000. Petitions for review were filed by persons representing the interests of life-tenants, all of whom were deceased, on the ground that the enhanced value of the real estate above the book value should be awarded to them as income: *Held*, that such enhanced value was part of the principal and passed to the remaindermen. Petitions dismissed.

Petitions for review and answers. O. C. Phila. Co., Jan. T., 1879, No. 448.

*W. W. Porter* and *Bell, Kendrick, Trinkle & Deeter*, for petitioners.

*Francis Shunk Brown, Jr., Gunnison, Fish, Clifford & Chapin* and *Brown & Williams*, contra.

GEST, J., Nov. 16, 1923.—These petitions were filed to obtain a review of the final account of the trustee, the adjudication of which was confirmed by this

court in Leech's Estate, 1 D. & C. 352, the appeals from our decision being dismissed by the Supreme Court in 274 Pa. 369. After the record was remitted to this court, a schedule of distribution was approved and filed, which is also claimed to be erroneous, and while certain matters of practice and procedure are involved, we prefer to dispose of the case on the merits of the important question which was argued.

As the reports of the case above mentioned, and the prior report of Leech's Estate, 18 Dist. R. 527, 228 Pa. 311, give the full history of the case, it does not seem necessary to recount it *in extenso*, and we need only quote those paragraphs of the will disposing of the income of the trust estate or portions thereof.

In the third paragraph, the will of testator provides for his wife as follows: "It is also my will that she shall have and enjoy the *rents and income* of any house which I may occupy at the time of my decease, or, if she prefer it, the possession thereof, . . . to be held and enjoyed by her during her natural life, for her sole and separate use;" and, after providing for the sale of the house in case his wife should become dissatisfied therewith, and the investment of the purchase money in the purchase of a suitable residence for his wife, he directs that the same shall "be held and enjoyed by her, or *the rents and profits thereof* to be received by her, in the manner aforesaid during her life, if she should remain my widow."

In the eighth clause of the will, the testator devised and bequeathed his residuary estate to his executors in trust "to receive the *income and profit thereof*, to pay the taxes thereon, to keep the real estate in repair, and to pay over one-third of *the net income* thereof in at least quarterly payments to my wife for and during the term of her natural life. . . . The remainder of the *net income and profits* thereof is to be paid in like manner to my three children, share and share alike, during their respective lives and to the issue of such of them as may die leaving issue (during the respective minorities of such issue), the said issue taking their deceased parent's share. . . . After these trusts have been fully executed, then the said property shall descend and go as my estate according to the then existing laws of Pennsylvania, provided however that if either of my sons should die leaving a widow I direct the said trustees to pay to such widow during life, if she shall so long remain my son's widow, such part of *the income of my estate* which would have been coming to such son as he may by any last Will and Testament in writing direct and appoint."

Now, it appears from the petitions for review that, prior to the death of S. Josephine Loftus, the daughter of the testator and the surviving life-tenant, on Aug. 17, 1921, the then trustees had foreclosed two mortgages held by the estate and had taken title to the real estate at sheriff's sale, which was carried in the account at the cost thereof, viz., the amounts of the mortgages and the expenses of the foreclosures. One, known as the Schuylkill River property, was thus taken in foreclosure June 6, 1896, the total cost being apparently $26,550, and the other, situated in Nicetown, was taken in foreclosure July 15, 1918, the total cost thereof being $62,093.84. In the schedule of distribution, approved Jan. 19, 1923, these book values appeared as part of the principal, which was awarded, in accordance with the decision of the Supreme Court, to the ten nephews and nieces of the testator. Prior to this schedule, viz., on Dec. 7, 1922, the Girard Trust Company, as substituted trustee, and also as attorney-in-fact for the nephews and nieces, agreed to sell the Nicetown property for $125,500, which was paid by the purchaser on April 7, 1923, and distributed by the trustee, and it appears that a similar agreement of sale of

4 D. & C.

the Schuylkill River tract was made by the Girard Trust Company, as trustee, May 22, 1923, for the sum of $132,000, which has not yet been consummated. The petitioners, who represent the interests of the life-tenants, all of whom are deceased, claim that the enhanced value of the real estate above their book values should be awarded to them.

We shall first mention the decisions of our Supreme Court on the subject.

In Hubley's Estate, 16 Phila. 327, a trustee sold real estate, devised for life, with remainder over, and invested the proceeds in City of Philadelphia loan, which appreciated in value. The gain was claimed by the life-tenant, but this court decided that the remainderman was entitled to the securities in kind. Judge Ashman assigned as one reason "that the fund takes the place of the original real estate, as to which, if the life-tenants took more than the annual product, they would commit waste, and from whose enhancement in price they would derive no benefit beyond a possible increase of rental." And Judge Penrose said: "A rise in the value of trust investments, like a rise in the value of lands held in trust, has always been regarded as an accretion of the principal, and, therefore, belonging to the remainderman (see Scholefield v. Redfern, 32 L. J. Ch. 627); just as a depreciation would fall upon him and not upon the tenant for life. It is quite probable, had the lands not been sold to or taken by the city, that the increase of value would at least have equaled that which has taken place with the city sixes, in which the purchase money has been invested. In that case, as the auditing judge has said, it would not have been supposed that the tenant for life was entitled to share the increase. The right of the remaindermen to the securities in kind seems quite as clear as their right to the possession of the land at the death of the tenant for life, had no sale been made." This case was affirmed by the Supreme Court in January, 1884, but apparently the opinion of the court has not been reported.

In Park's Estate, 173 Pa. 190, the testator gave his residuary estate in trust to receive and collect *the rents of the real estate and the income and profits of the personal estate,* and, after deducting taxes, expenses and certain annuities, to pay the residue of *the net income* arising from said real and personal estate to his daughter, Margaretta, during her life, with remainder to her children. The trustees invested moneys of the estate in two mortgages, the interest fell into arrears, the trustees foreclosed the mortgages, bought the property in at sheriff's sale, carried them at their cost, which was the amount of the mortgage plus costs, and then sold the real estate at a considerable gain, during the lifetime of Margaretta, who claimed the said gain as income, in addition to interest on the investment, but the auditing judge, Over, J., dismissed her claim. Hawkins, P. J., however, disagreed with him, and the court being equally divided, the decree of Over, J., stood as the final decree of the court. The Supreme Court reversed in a short opinion, adopting as theirs the dissenting opinion of Hawkins, P. J.

In Graham's Estate, 198 Pa. 216, the residuary estate, real and personal, was given to trustees in trust to receive and collect *the rents, profits and dividends and income* and to use and apply *the income* for the support of testator's three sons and their wives and children, and on the death of the survivor of the children the trustees were directed to divide and distribute the residuary estate among the children and issue of the sons. Some of the residuary real estate was sold and a mortgage taken for part of the purchase money. This mortgage was exchanged for certain steel company bonds, and at the same time the trustee purchased other bonds of the same company with the proceeds of other residuary real estate. These bonds were sold at a considerable premium and the proceeds were reinvested in other securities. The life-tenant

claimed to be entitled to the gain, but the Orphans' Court of Allegheny County, then composed of Judges Hawkins and Over, held it to be part of the *corpus,* and an appeal was dismissed by the Supreme Court, who adopted the opinion of Judge Over. In his opinion, Judge Over relied on many of the cases cited in his opinion in Park's Estate, and referred to the latter case as follows: "It appears, however, from the opinion (in Park's Estate) that there was a misapprehension as to the provisions of the will in that case, as it is quoted as giving both the income and profits to the tenant for life, and as the income alone is given here, it may be for this reason the case is not in point."

In Kemble's Estate, 201 Pa. 523, the testator authorized his trustees to sell all or any part of his residuary estate and to invest the proceeds and pay *the income* to his wife and children. The trustees exchanged certain shares of stock belonging to the estate for the shares of another corporation in the proportion of ten for twelve, and it was held that the additional two shares were a part of the principal of the estate, whether they represented a profit or not.

In Neel's Estate, No. 2, 207 Pa. 446, the will directed the trustees to sell and convert any or all of the real or personal estate, providing that "the moneys realized therefrom and all other moneys belonging to me" (we quote from the will as printed in the paper-books) should be safely invested by his said trustees, and that "*the rents, issues and profits* realized from said trust from investments made or continued by the said trustees shall, after deducting and paying the current expenses of the trust, be distributed" to his wife and other persons for their lives, etc., with remainder over. The trustees, in order to protect the interest of the estate in the partnership of Neel & Wempler, bought in some pieces of real estate of the partnership at receiver's sale. These were afterwards sold by the trustees at an advance of over $10,000, and this amount was held to belong properly to the *corpus* of the estate, and not to be distributed as income, after deducting the amount paid as interest on money borrowed to make the purchase. Park's Estate, 173 Pa. 190, was relied on by the appellant in this case, and Graham's Estate, 198 Pa. 216, was relied on by the appellee.

In Quay's Estate, 253 Pa. 80, the testator directed his estate, real and personal, to be converted into money, and gave one-fifth part thereof to his trustees in trust to invest and collect *the incomes and profits* arising therefrom and to pay said *income and profits* to his son, Andrew G. C. Quay, "so long as he shall live," with the restriction that the total amount paid in any year to his son, together with all such other incomes as he might have from other sources, should not exceed $4000; and he further directed that any such excess over $4000 should be invested by his trustees and added to the principal, with a gift over in remainder at his son's death to the testator's children then living. The trustees received in the distribution of the estate, in lieu of cash, shares of American Tobacco Company, common stock, which they sold, realizing from the sale some $36,000 in excess of the valuation at which they had accepted the stock in distribution. The trustees maintained that this belonged to the *corpus* of the trust, while, on the other hand, it was contended by the son that the same was income; that the accumulation directed by the will was contrary to the Act of April 18, 1853, P. L. 507, and that the testator, therefore, died intestate with respect thereto, so that it passed to the testator's next of kin. The Orphans' Court of Beaver County, on the authority of Park's Estate, awarded the fund in dispute to the five children of the testator, including Andrew G. C. Quay. The Supreme Court affirmed this decree, on the opinion of the lower court, citing, however, Stokes's Estate, No. 1, 240 Pa. 277.

4 D. & C.

Middleton's Appeal, 103 Pa. 92; s. c., Ware's Estate, 12 W. N. C. 571, involved merely a question of construction, and the Supreme Court, following the literal language of the will, held that the gift to the remaindermen was of $10,000 only, so that they were not entitled to the securities in which the fund was invested and which appreciated in value. Whether this case can be reconciled with Boyer's Estate, 174 Pa. 16, was queried by Ashman, J., in Grimm's Estate, 6 Dist. R. 21; but both cases depend simply upon the interpretation of the gift to the remaindermen, and, in our judgment, do not affect the question in the present case. We mention them merely for the sake of completeness.

Now, in the case at bar the learned counsel for the petitioners rely on Park's Estate, on the ground that the will directs the payment of *income and profits* to the life-tenants, while the respondents rely on Graham's Estate and Neel's Estate, above cited. It, therefore, becomes necessary for us to discuss the decisions in order to determine to what extent they are controlling. As to Hubley's Estate, the only difference mentioned by Hawkins, P. J., in Park's Estate is that the real estate which was sold in Hubley's Estate was specifically devised. Indeed, that learned judge conceded that if the gift in Park's Estate had been of specific property for life, his decree would have been otherwise, but the reason he gives, it seems to us, is equally appropriate where the estate is given as a whole, namely, that the proceeds, when realized, would have been the measure of value of the property which the remaindermen would have had a right to demand at the death of the life-tenant. Nor do we see any distinction between real estate owned by the testator at the time of his death and real estate purchased by the trustee to protect an investment, whether the investment was one made by the testator himself or one made by the trustee after his death. As to Park's Estate, a perusal of the opinion shows that it rests in effect upon two grounds: First, that the trust assets were not specifically given, as in Hubley's Estate, and, secondly (and this seems to have been the controlling feature of the case), the will, according to Judge Hawkins (though here there was an error), gave the life-tenant "all the *income and profits* during life," and the principal to her children at her death, and then it was argued that the *profits* included the gain realized by the sale of the foreclosed properties. Two classes of decisions were relied on to support this; first, cases like Eley's Appeal, 103 Pa. 300, which hold that the income realized from a coal lease of an "open mine" belong to the life-tenant; and, secondly, cases like Earp's Appeal, 28 Pa. 368, holding that when extraordinary dividends on stocks are declared, the dividends earned after the death of the testator belong to the life-tenant. Oliver's Estate, 136 Pa. 43, was also mentioned, where a company, organized for the purpose of buying and developing mining properties and selling the same, declared dividends derived from a sale of land which were held to be payable to the life-tenant. It seems to us that cases of these several classes depend upon entirely different principles, and Graham's Estate, 198 Pa. 216, appears to us to lead to the contrary conclusion, for there the gain was derived from the sale of stocks in which were invested the proceeds of a purchase-money mortgage reserved on the sale of the testator's realty. We fail to see any substantial distinction between such a case and Park's Estate, where the gain was derived from the sale of real estate taken in foreclosure to protect a mortgage investment. The meaning of the word "profits" in the two wills we shall presently advert to.

Kemble's Estate, 201 Pa. 523, follows the theory of Graham's Estate, while Neel's Estate, No. 2, 207 Pa. 446, does so distinctly, for there the trustee

Leech's Estate.

bought the partnership real estate to protect the testator's interest in it, just as in Park's Estate the trustee foreclosed a mortgage and bought the real estate to protect their investment. Quay's Estate, 253 Pa. 80, stands on its own facts. Apparently, the Supreme Court rested on the distinction between "income" and "profits," to which we shall presently allude, and also brought the case within the doctrine of Stokes's Estate, No. 1, 240 Pa. 277, a case of extraordinary dividends, some part of which were earned before and some after the death of the testator, and which laid down the doctrine that, in determining the share of the life-tenant, it was only necessary to determine the value of the stock at the time of the testator's death, so that any gain belonged to the life-tenant. We assume that Quay's Estate was decided on the ground that its facts brought it, in the opinion of the Supreme Court, within this "extraordinary profits" rule.

It seems to us from this review of the cases that the Supreme Court has not definitely decided the exact question raised in this record.

We now come to the question whether any valid distinction can be made, as was stated by Judge Hawkins, in Park's Estate, between a gift of *income or interest* and a gift of *income and profits* and the like. Now, it seems to us that the apt words to express the income of personal estate are "interest and dividends;" that is, the interest on bonds and the dividends on stock; while the apt words in the case of real estate are "rents, issues and profits:" Oram *v.* Peirce, 73 N. J. Eq. 391; Vedder's Will, 15 N. Y. Supp. 798. Indeed, Blackstone's definition of "rent" is "a certain profit issuing yearly out of lands and tenements corporeal" (2 Blackstone Comm., 41), and Blackstone goes on to say that it must issue out of the thing granted and not be part of the land or thing itself. The word "issues" occasions no difficulty, for, as the Supreme Court said in Perot's Appeal, 102 Pa. 235, the word "issues" is an apt term to indicate the rents and profits derived from realty. Profits, while including rent, may have a wider meaning, as the term includes the annual produce of land, such as crops, fruits or grass, and there may be a profit *a prendre*, such as a right of common, a right to take fish or game, or, in the old common law, the casual profits of fines, etc., which are enumerated in Strachan on Trust Accounts, p. 24; Campbell *v.* Wardlaw, 8 App. Cases, 645; but a profit is never part of the thing itself: 2 Blackstone, 41. In several cases involving the respective rights of life-tenant and remainderman, the apt comparison is used of a tree and its fruit: De Gendre *v.* Kent, 4 Eq. 283; Taylor *v.* Harwell, 65 Ala. 1. The fruit produced and annually reproduced, whether the crop be abundant or scanty, belongs to the life-tenant, but the tree itself, increasing or decreasing in value, as it may, from year to year, will pass to the remainderman on the death of the life-tenant.

There is certainly no presumption that when a testator gives, as he does here, "rents and income" or "rents and profits" of real estate or "income and profits" of a residuary estate, he means anything more than "income." Profit, in such a connection, means only revenue or return, and the authorities hold that "rents and profits," "income" or "net income" are all equivalent expressions: Andrews *v.* Boyd, 5 Greenleaf, 199; Earl *v.* Rowe, 35 Me. 420; Beers *v.* Narramore, 61 Conn. 13; Oram *v.* Peirce, 73 N. J. Eq. 391; Re Stevens, 95 N. Y. Supp. 297.

Of course, in every case it is the intention of the testator that must govern the interpretation of his will and determine the extent of his gift. Now, in the present case, it seems impossible to believe that the testator, in his use of the word "profits," intended anything other than income. Thus, in the third paragraph he gives the *"rents and income"* of his residence to his wife, or, if

she prefers it, the possession of it for her life, and provides, in case of her dissatisfaction with the house, that the executors shall sell it and buy another home with the proceeds, the same "to be held and enjoyed by her or *the rents and profits* thereof to be received by her." Surely, no one can suppose for a moment that while the widow could live in the residence or be paid the rents and income thereof, yet, if the house were sold and another house purchased, to the *"rents and profits"* of which she would be entitled, and if this substituted house were sold at an advance, she could claim such increase in value as "profits." So, in the eighth (and residuary) paragraph the executors are directed to receive *the income and profit* of the real estate and pay over to his wife for her life one-third, not of the *"income and profits,"* but one-third of the *"net income"* only, while the remainder of the net *"income and profits"* is to be paid to his three children. Can any one suppose that he meant different things by "income and profits," and thus intended to differentiate in this way between his widow and his children? And further on in the same paragraph, after giving his children a share of "income and profits," he provides that if a son should leave a widow, the trustee should pay to such widow, during life or widowhood, "such part of the *income* of my estate which would have been coming to such son as he might by his will direct and appoint." Surely, income and profits, as here used, are merely synonymous. The words in this will were probably used by this testator, as they have been by many others, from a hazy recollection of another testator's tautology. The inevitable inference in this case is that the net *income and profits* given to the children mean exactly the same thing as *income*, and nothing more, and that the gift to the life-tenants does not include any gain from the increase in value of real estate thus purchased under sheriff's sale in foreclosure of mortgages. This conclusion is in accordance with the general course of decisions where trust assets have increased in value: Roberts's Will, 82 N. Y. Supp. 805; Re Clark, 62 Hun (N. Y.), 275; Re Vedder, 15 N. Y. Supp. 798; Re Proctor, 85 Hun (N. Y.), 572; Re Biden, 33 N. Y. Supp. 196; Gray *v.* Darlington, 82 U. S. 63; Re Gerry, 103 N. Y. 445. We only add that if the foreclosed real estate had been sold at a loss, as so often happens in cases of foreclosure of mortgages, the theory of the petitioner would logically lead to the consequence that the loss of principal should be recouped from income. The maxim *"Qui sentit commodum sentire debet et onus"* is a just one, and for an apposite illustration we refer to Letterle's Estate, 23 Dist. R. 471, 248 Pa. 95.

As we have arrived at our conclusion upon the general principles differentiating capital and income, as well as the analysis of the particular will under discussion, it seems unnecessary to prolong this opinion by discussing the other questions which were argued; whether the gain or profits included in an increased value of the unsold real estate can be awarded or apportioned to the life-tenants before they have been actually realized by a sale during the life tenancy, and whether a review should be allowed in any event in the unusual circumstances of the case.

The petitioners in one case have filed a replication to the answer, but as both cases were put down for hearing upon the petition and answers and so argued, we have disregarded the replication.

The petitions for review are dismissed.